Joanna R. WAJDA

v.

The PENN MUTUAL LIFE INSURANCE COMPANY.

Civ. A. No. 76–2516.

United States District Court, E. D. Pennsylvania.

Dec. 15, 1981.

---

14. Code of Professional Responsibility as adopted by the Supreme Court of the State of Florida, 235 So.2d 723 (1970).

William H. Brown, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff.

Jerome Hoffman, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Plaintiff, Joanna R. Wajda, charges that defendant, The Penn Mutual Insurance Company (Penn Mutual), discriminated against her in employment on account of sex in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.* Specifically, plaintiff contends that she was illegally denied promotional and job opportunities and ultimately was terminated from her employment on account of her sex. In addition, plaintiff contends that her termination from employment and other adverse employment actions taken against her, were in retaliation for her filing of a claim of employment discrimination with the EEOC and the instant civil action.[1] 42 U.S.C. § 2000e–3.

By agreement the trial was bifurcated, with the issue of liability to be tried first and the question of remedy to be tried, if necessary, at a later date. The liability

1. Plaintiff brought this action in 1976 on behalf of herself and other female employees of Penn Mutual. In 1978 I granted plaintiff's motion for class certification. *Wajda v. Penn Mutual Life Insurance Company*, 80 F.R.D. 303 (E.D.Pa. 1978). The class aspects of this litigation were resolved upon entry of a consent decree and settlement order on November 17, 1980 (Document No. 98). Accordingly, only plaintiff's individual claims are presently before me.

phase was tried from November 2–9, 1981. Following completion of the evidence, the parties submitted requests for findings of fact and conclusions of law. On pleadings, proof, and the written submissions of the parties, I make the following

## FINDINGS OF FACT

1. Joanna R. Wajda began working for Penn Mutual as a clerk in January 1940 following graduation from Frankford High School in Philadelphia, Pennsylvania. From then until she was terminated from the company in July 1981, she held a variety of jobs with Penn Mutual ranging from clerical and secretarial positions through Senior Investment Analyst.

2. The Penn Mutual Insurance Company is engaged in various aspects of the insurance business. Its corporate headquarters are located in Philadelphia, Pennsylvania.

3. During the course of her employment with Penn Mutual, Wajda took courses at the University of Pennsylvania Evening School of Accounts and Finance from 1946 to 1952, when she received a certificate of proficiency with honors. Among the courses she took were courses in accounting and rudimentary courses in economics and finance. (Exhibit P10).

4. In 1952, following receipt of her certificate of proficiency, Wajda was offered a position with the Fire Association of Philadelphia. Wajda, who had theretofore worked as a secretary, rejected that offer when Penn Mutual offered to promote her to the position of investment assistant to Albert Cederstrom, head of the Direct Placement and Corporate Loan Division of Penn Mutual's Securities Department. Wajda's work in this capacity consisted of compiling financial data regarding companies which sought loans from Penn Mutual. Wajda did limited analysis of the prospective companies solely from a maintenance standpoint, *i.e.*, she checked for assurance of payment of interest and repayment of principal. Wajda remained in the Securities Department until November 1980, working in a number of that department's divisions.

5. Starting in 1952, Wajda resumed her course work at the University of Pennsylvania Evening School of Accounts and Finance and, in 1959, received an associate degree in business administration with honors. In her course of study, Wajda took one course in Financial Analysis in 1952–1953. (Exhibit P10). She has not taken any formal course work in finance since that time.

6. On September 11, 1973, Wajda filed charges with EEOC alleging that she had been discriminated against by Penn Mutual in salary and promotions because of her sex. Wajda's claim of discrimination is based upon her employment in the Securities Department of Penn Mutual. The charge was deferred by EEOC to the Pennsylvania Human Relations Commission.

7. Penn Mutual's Securities Department is responsible for investing the Company's assets profitably in various types of ventures. The investments run into hundreds of millions of dollars. The Securities Department as it existed prior to January 1, 1981, was divided into four divisions:

(a) Equity Investment (responsible for managing the Company's common stock portfolio, which has assets of over $185 millions). This division will hereinafter be referred to as the "common stock" division.

(b) Fixed Income Investment (responsible for investing in and managing the Company's corporate bonds and preferred stocks. In addition it also is responsible for making direct placements to utility companies. This division has assets of over $700 million).

(c) Private Placement (responsible for negotiating multi-million dollar private loans to industrial corporations, other than utilities. It has over $800 million in assets). This division will hereinafter be referred to as the "direct placement" division.

(d) Treasury/Administrative (responsible for performing money and banking transactions for the entire Company, plus administrative and personnel functions for the Securities Department).

On January 1, 1981, the Securities Department was merged with the Mortgage Department and the combined department is now known as the Investment Department. Except where otherwise noted, this action concerns the Securities Department as it existed prior to the January 1981 reorganization.

8. In the late 1950s, while still working primarily in direct placement under Cederstrom and later Edward J. Klinger, Wajda began assisting Henry Baggs, financial secretary, on the trading of common stocks. In addition, during this period Wajda assisted Cederstrom in preparing data for submission to the National Association of Insurance Commissioners' (NAIC) evaluation system, which analyzed the investments made by American insurance companies. Cederstrom retired in the early sixties and was replaced as financial vice president by Floyd Starr, for whom Wajda continued her NAIC work. During this time Wajda remained as an investment assistant and her job was in the non-exempt category. In 1968, as part of a company-wide re-evaluation of jobs, Wajda's position was upgraded to an exempt category job.[2]

### A. *Common Stocks*

9. In 1965 Wajda was given the function of trading common stocks in the Equity Investment division, working under Henry Baggs, financial secretary. Baggs had joined the Company in the fifties and was in charge of the common stock operation. Wajda's responsibility in the common stock area was limited to executing buy and sell orders within price limits fixed by Baggs who had the ultimate decisionmaking responsibility. Before Wajda, this task had been performed by Charles Butler, who was assistant treasurer and a Company officer. In addition to his common stock trading duties, Butler also had some responsibility for department personnel and the trading of commercial paper. When Butler was promoted to treasurer, Wajda assumed only the trading of common stock function and she was not promoted to assistant treasurer.

10. During the 1950s and 1960s, Penn Mutual followed what can only be characterized as a conservative investment policy, relying primarily on low yield, low risk investments in which the major consideration with respect to investments in loans was assurance of payment of interest and repayment of principal. Concomitantly, the Company's common stock portfolio was relatively small and consisted of relatively safe investments.

In or about 1972, Frank Tarbox became president of Penn Mutual and implemented a new policy favoring an aggressive investment posture. For example, insofar as direct placement loans were concerned, the Company concentrated on obtaining "equity kickers", in which the Company sought not only payment of interest and repayment of principal, but also an ownership interest in the corporations to which loans were made. Additionally, the Company increased fourfold its common stock portfolio. Existing managerial personnel, who for the most part came up through the ranks and lacked formal investment education and experience in aggressive investment management, were ill suited to these changed investment objectives.

11. Despite the importance of the Securities Department in the Company, it has been operated with relatively few personnel, ranging from 10 to 14 exempt (non-clerical) employees from 1970 to 1980. Because of the high degree of skill required as a result of the changed investment objectives in the early 1970s, Penn Mutual began to hire either persons experienced in portfolio management or college trainee applicants with the potential (as manifested by their education) to fill investment officer positions. College trainees were required to have a bachelor's degree in finance, economics, or accounting, and were expected to continue with their education upon joining the Company.

12. Beginning in 1958, Penn Mutual engaged in a college recruitment program.

---

2. Exempt category jobs are jobs which, pursuant to 29 U.S.C. § 213(a), are exempt from the wage and hour provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206 207.

From 1965 (when Wajda assumed responsibility for common stock training) to 1981, the Securities Department offered employment to seven college trainees, two of whom, Ellen Ceasar (1974) and Barbara Harris (1979), were female. Ceasar, although offered the position, was ultimately not hired because of a company-wide hiring freeze.[3]

13. The purpose of the college trainee program was to identify and train those persons who had the potential to move up Penn Mutual's corporate ladder. In the Securities Department the progression was as follows: college trainee, investment or security analyst, assistant investment officer, investment officer, 2d vice president, and so on. This progression was not automatic, and was not simply a function of length of tenure. Before reaching another rung of the ladder, a person had to show that he or she was capable of assuming increasingly more significant levels of responsibility.

(a) Before being promoted from a security analyst to assistant investment officer in direct placements the person seeking promotion had to have demonstrated that he or she had the ability to analyze, structure, negotiate, and manage deals on his or her own.

(b) In the common stock area it was essential that the person show that he or she had the ability to make decisions on buying and selling stocks and had the ability to manage portfolios before he or she could be promoted to assistant investment officer.

(c) Before a promotion to assistant investment officer would be granted in either common stocks or direct placements, it was expected that the analyst increase his or her academic qualifications by obtaining either a Master of Business Administration Degree (MBA) in either finance or economics or take courses toward professional certification as a Chartered Financial Analyst. Every person promoted to assistant investment officer in direct placements or common stocks from 1972–1980 had at least a bachelor's degree and had taken steps to acquire an advanced degree.

14. As part of Penn Mutual's policy to upgrade its personnel in order to prepare for its change to a more aggressive investment posture, Edwin W. Crysler, Jr. was hired as Assistant Vice President-Securities on January 1, 1972. Crysler came to Penn Mutual with vast experience in the investment field. He is a Chartered Financial Analyst and a past-president of the Financial Analysts Association. Prior to joining Penn Mutual, Crysler had been an officer with Wellington Management Company where he was in charge of the purchase, sale and management of fixed income investments.

15. As Assistant Vice President at Penn Mutual, Crysler had responsibility for investments in fixed income bonds and direct placements in public utilities.[4] Shortly after he arrived at Penn Mutual, it became evident that Baggs was near retirement and William H. Loesche, Vice President-Securities and Corporate Treasurer, requested that Crysler assist Baggs in the common stock function with the goal that Crysler would ultimately assume full responsibility for that area in addition to other areas for which he had responsibility.

---

3. Plaintiff has claimed that no hiring freeze was in effect at that time, arguing that the only evidence of a freeze is the policy promulgated in 1975. (Exhibit P27). I credit, however, the testimony of Richard Yoder, presently 2d vice president and treasurer, that a hiring freeze was also in effect in 1974. As explained by Yoder, and as stated in Exhibit P27, the 1975 freeze was a formal part of a company-wide value analysis program whereby the Company was attempting to determine which tasks were important to Penn Mutual's success. The 1974 freeze, on the other hand, was not part of a long range plan to make the Company more efficient but rather was a reaction to the economic recession which took place in that year. Support for Yoder's explanation is supplied by the fact that the form for obtaining approvals for new hires in the 1975 freeze announcement (Exhibit P27, last page), had been in use since May of 1974.

4. The function of direct placements in public utilities was, for reasons not explained at trial, kept separate from the function of direct placements in general industry.

16. Crysler, anticipating growth in the common stock portfolio from $50 million to $200 million, began to increase and professionalize the staff in this area which, theretofore, had consisted of Baggs and Wajda. In June, 1972 Crysler hired Edward G. Hoffman as an investment officer to manage the portfolio which had been previously managed by Baggs. Hoffman had been a portfolio manager for approximately six years with Aetna Life Insurance Company and held an MBA in Finance from New York University. He also had similar practical experience with a New York bank and the Ford Foundation.

17. In August 1973, Carl M. Lindberg was hired as an investment officer to assist Hoffman and to manage two smaller common stock portfolios on his own. Lindberg had vast portfolio management experience having previously been employed in various portfolio management capacities by Drexel Burnham (and its predecessor Drexel Firestone), Brown Brothers-Harriman, and a wealthy private investor. (Exhibit D16). Lindberg received an AB degree in Economics from the College of William and Mary in 1962.

18. Crysler did not consider Wajda for the position filled by Hoffman since she lacked the educational background and her trading experience at Penn Mutual did not provide the requisite experience in portfolio management. I find that Wajda was not qualified for portfolio management in common stocks as she lacked both the educational background and the ability to analyze markets and stocks, essential for that position. Her experience as a trader of common stocks, which consisted of implementing other's decisions, did not equate to the ability to analyze complex market investments. Wajda admitted that she was not qualified for portfolio management.

19. Similarly, for the reasons stated in Finding 18, supra, Wajda was not qualified for the management portfolio position filled by Lindberg.

20. In Spring of 1972, after Hoffman was hired, Wajda complained to Financial Vice President Allen C. Thomas about her perceived lack of upward mobility in the common stock area. She informed Thomas that she desired to return to the direct placement area where she had worked prior to 1965, and which she perceived as providing the greater opportunities for career advancement. In April 1973 she repeated her complaints and request to Loesche who had replaced Thomas as Financial Vice President. Nothing came of either request.

21. Wajda went to EEOC in June 1973 and for the remainder of that summer worked on preparing her charge of sex discrimination and contemplated whether to actually file the charge.

22. In August 1973, prior to the time she reached a decision on whether to file a charge, and before anyone in management at Penn Mutual had knowledge that she was contemplating filing a charge, Wajda had a discussion with Crysler who had recently assumed responsibility for the common stock function. Again Wajda complained of her perceived lack of upward mobility in common stocks. Crysler, recognizing Wajda's undisputedly faithful and efficient service to Penn Mutual since 1940, agreed to attempt to get her additional pay for the trading work she was undisputedly doing in an excellent and efficient manner.

23. Upon receipt of Crysler's request for a salary increase for Wajda, the personnel department surveyed other insurance companies and found that Wajda's pay for her job as trader was competitive with that paid by other firms for the same work. Personnel concluded that unless Wajda was given additional responsibilities, she would not be entitled to an increase in salary. Crysler and Richard F. Yoder, treasurer, who was in charge of the department's personnel, decided to expand Wajda's job to include equities research and analysis in addition to her trading function. The application for promotion was resubmitted to, and approved by, the personnel department.

24. Although, after she had her discussion with Crysler, Wajda had some doubts about whether she should file her EEOC charge, she ultimately decided to go forward and, on September 11, 1973, she

presented the charge to the EEOC, which deferred to the Pennsylvania Human Relations Commission for sixty days as required by law.

25. In November 1973, Crysler informed Wajda that she was promoted to "Equity Research Analyst and Trader", a position which resulted in Wajda's going from a C to F (a higher) level exempt employee.

26. In the course of obtaining approval of Wajda's promotion, Crysler learned, to his surprise, that Wajda had filed a charge with EEOC. I find that the decision to promote Wajda was unrelated to her filing sex discrimination charges since Crysler's decision to try to improve Wajda's position was made well before he or anyone else at Penn Mutual learned of Wajda's charge. The reason for the delay between the time that Crysler first went to personnel and the time that Wajda was actually promoted resulted from first, the time required for surveying other insurance companies to determine whether Wajda's salary for the trading function was competitive, and second, when the initial request was turned down, formulating additional duties within Wajda's capabilities to justify a salary increase.

27. The ability to analyze common stocks, to select potential investments, and to manage portfolios, was a requirement for promotion to assistant investment officer in the common stock area at Penn Mutual. (See Exhibit D15). Therefore, the only way that Wajda could achieve her career goals of becoming an officer at Penn Mutual was to obtain the rudimentary analytical ability which she lacked because of her insufficient formal education in finance and economics.

28. Crysler directed his portfolio managers, Lindberg and Hoffman, to assign Wajda equity research and analysis tasks and to train her in such functions. Although Hoffman and Lindberg gave Wajda such work to perform, Wajda continued to focus primarily on her trading duties and failed to competently accomplish her new research and analytical duties. Lindberg continued to try to train Wajda but it soon became evident that she lacked the ability to synthesize data essential to reach conclusions regarding investments. After a period of time Wajda's enthusiasm for learning her new tasks waned and she directed her focus to compiling data for analysis and trading stocks, both of which tasks she performed excellently.

29. Hoffman was fired in January 1976 because of policy conflicts with Crysler. His portfolio management responsibilities were assumed by Lindberg. Wajda, who never obtained the essential analytical skills, was still not qualified for portfolio management and was not considered for either Hoffman's or for Lindberg's position.

30. The company advertised for a replacement for Lindberg. Only females were interviewed for the job and ultimately Bobbye C. Fritz, who had experience in portfolio management, was hired. Fritz had a bachelor's degree in economics and, prior to being hired by Penn Mutual, she had taken evening courses in economics and securities analysis, and had passed a number of professional certification examinations. In addition, Fritz had previously worked with a Boston law firm where she gave financial advice to the firm's trust managers. Fritz was far more qualified for Lindberg's position than was Wajda.

31. As will be discussed infra, Wajda left the common stock area in the winter of 1977. While in common stocks, Wajda was not qualified for any position that became available in that area and I find that she was not denied any position on account of her sex. In addition, I find that Wajda's failure to achieve promotion past "Equity Research Analyst and Trader" was because she was not qualified to perform the investment analysis essential to obtaining officer status, and not because of sex discrimination. As a matter of fact, it is questionable whether Wajda was qualified for the promotion she did receive since she did not adequately perform the analysis functions assigned to her. Further, I find that Wajda's failure to obtain the requisite knowledge for career advancement resulted from her failure to persevere with the on the job training made available to her by Lindberg. Lindberg attempted to train Wajda in good

faith, and no barriers were placed before Wajda as retaliation for her filing of a charge with EEOC. Finally, I find that Wajda was treated fairly during her tenure in the common stock area at all times relevant to this action.

## B. *Direct Placement*

32. The private placement division of the Securities Department was also affected by the Company's more aggressive investment policy in the 1970s. Since the 1950s this division was managed by Ralph Miller. Miller joined the company in the 1930s as a clerical worker and, in an "Horatio Alger" fashion, rose through the corporate ranks to the position of vice president of Corporate Loans. Wajda considered herself comparable to Miller and others in direct placements in the 1950s and 1960s because they came from similar backgrounds. Much of Wajda's career dissatisfaction, as well as her belief that the direct placement area was the division in the Securities Department which offered her the greatest career opportunities, stemmed from this view. By 1972, however, this perception was no longer valid. Miller and others, such as Klinger (who rose to the position of assistant financial secretary), were products of a bygone day at Penn Mutual when its investment practices in direct placements were conservative and basically uncreative. Under Miller's direction the direct placement division focused on long-term low-yield loans in relatively low-risk companies. Prior to the early 1970s, Miller's and the direct placement department's reputation within the company for making safe investments was excellent, but high-level corporate management came to the conclusion that the division was not generating sufficient capital gains.

33. As part of the same corporate strategy to bring in new blood that saw Crysler hired in common stocks, the direct placement division hired David M. DuPont as an investment officer on January 15, 1973. Just as Crysler was hired to replace Baggs, it was intended that DuPont would eventually replace Miller as head of direct placements. DuPont held an MBA in corporate finance from Babson College and, prior to joining Penn Mutual, had worked for six years with State Mutual Insurance Company in that firm's direct placement department. In addition to being skilled in the traditional aspects of direct corporate financing, DuPont was also skilled in corporate acquisitions and equity financing. Although by this time Wajda had communicated her desire to return to direct placements (*see* Finding 20, *supra*), she was not considered, and she was clearly not qualified, for DuPont's position.

34. With the arrival of DuPont, Penn Mutual's direct placement policy moved from total reliance on loans with assured payment of interest and repayment of principal, to loans involving greater risk, but with prospects of higher rates of return, including equity interests.

35. When DuPont came to Penn Mutual in January 1973, the direct placement division consisted of Miller and Ronald Angevine, who had joined Penn Mutual in 1970 as a college trainee and had been promoted to Security Analyst in the winter of 1972.

36. In early 1974 there was an increase in Penn Mutual's available cash flow for investment. Yoder, Miller, Loesche and DuPont decided that a staff increase in direct placements was necessary. Ellen Joy Caesar, who had a bachelor's degree in finance from Pennsylvania State University, was recruited through the college recruitment program and, after being interviewed by Yoder and Miller, was offered the position of college trainee. Loesche also approved the decision.

As previously noted (*see* Finding 12 *supra*) Caesar was not hired because of a company-wide hiring freeze imposed prior to final approval of her application. Yoder and Miller appealed the decision not to hire Caesar to Tarbox, President of Penn Mutual. Tarbox refused to make an exception to the hiring freeze despite the fact that Caesar had been informed that she had the job and had undergone the required physical examination.

37. Miller approved the hiring of Caesar notwithstanding that he was admittedly bi-

ased against women. On a number of occasions, Miller had let it be known that he felt that women were unreliable and that they posed special problems when they had to travel with men. These were Miller's personal views but, as evidenced by his approval of the hiring of Caesar and by the fact that Bobbye Fritz (assistant investment officer in common stocks, who came to Penn Mutual in 1976) regarded him as her mentor, Miller recognized that he was bound by company policy and he did not apply his personal views in his official decisionmaking.

38. No hiring took place in the direct placement division for the remainder of 1974. In May of 1975, after the hiring freeze was lifted, Penn Mutual advertised for a securities analyst trainee in direct placement. (Exhibit D3). J. Gary Brown, who held a BS in business administration with majors in finance and accounting, was eventually selected for the position. Although Yoder knew that Wajda was interested in returning to direct placements, he did not consider her for the trainee position because it would have represented a substantial cut in salary for her. Indeed, Wajda was unwilling to accept a position at a trainee's salary and did not request that she be considered for the job. In addition, Brown was more qualified than Wajda, having recent education in the changing field of finance.

39. At or about the same time that Brown was hired, it was decided that the cash available for investment in Penn Mutual was sufficient to justify the operation of two direct placement teams, and a decision was made to add an investment officer to head the second team. At this time the division consisted of Miller, DuPont, Angevine and Brown.

40. For the investment officer position, the Company was looking for someone who had at least a Bachelor's degree and preferably an MBA degree in accounting or finance, and who had at least five or more years experience in the direct placement area. Yoder, DuPont and Miller considered promoting Angevine but decided that, at that point in his development, he lacked the experience to structure, negotiate and manage transactions, a function which was essential to the officer position. Accordingly, the Company placed an advertisement for the position in the Wall Street Journal.

41. Wajda, who was still Equity Research Analyst and Trader in the common stock area, saw the advertisement and, after a conversation with someone from EEOC, decided to apply for the position. She sent a letter to Loesche who, approximately one week later, informed her that she lacked the immediate experience for the job.

42. Wajda was not denied the position because of her sex but rather was denied the position as investment officer in direct placements because she was not qualified for the following reasons:

(a) Her last experience in direct placements was in 1965 and she lacked knowledge of the corporate financing techniques which were being used in the 1970s.

(b) She lacked the educational requirements for the investment officer position and her prior experience did not compensate for her lack of formal education.

(c) Her experience in the common stock area did not qualify her for an officer's position in direct placements in 1975. The two areas were distinct types of financial activity. The common stock area involved quick decisions on whether to purchase securities issued by other corporations, whereas the direct placement area involved the structuring, negotiating and monitoring of long-term corporate financing. In addition, Wajda had not satisfactorily performed the analytical part of her position in common stocks.

43. The investment officer position was eventually filled by A. Kent Weymouth, Jr., who held a MBA in Finance from the University of Maryland and who had passed a series of professional certification examinations. For five years prior to joining Penn Mutual, Weymouth worked with Monumental Capital Management, where he had worked his way up from securities analyst-

trainee to Assistant Secretary. At Monumental, Weymouth had responsibility for originating, negotiating, analyzing and managing private placements and was skilled in modern corporate financing techniques. (Exhibit D–30). Weymouth was far more qualified than Wajda for the position of investment officer in direct placements.

Upon Weymouth's arrival the direct placement department was split into two teams, one headed by Weymouth, assisted by Angevine, and the other by DuPont, assisted by Brown. After a number of months, the teams switched and Brown was assigned to Weymouth and Angevine to DuPont.

44. During this period of time (mid-1970s), Wajda became increasingly frustrated over her failure to get ahead in the company and her personality turned somewhat abrasive. She considered that any and all criticisms of her were motivated by sex discrimination and she blamed any adverse career action, such as failure to be promoted, on such discrimination. When Loesche told her that she was not qualified for the position filled by Weymouth, he told her that people in direct placements did not want to work with her because of her abrasive personality. Wajda admitted that she was "outspoken" but blamed it on what she considered the unfair treatment which she has been subjected to through the years.

45. Angevine had pursued his studies in the evening while at Penn Mutual, receiving an MBA from Temple University. He was promoted to assistant investment officer in the winter of 1976. On August 5, 1977, Angevine resigned from Penn Mutual to take a position with another company.

46. Approximately five weeks later on September 12, 1977, Robert A. Burstein, an assistant investment officer in the company's fixed income division, resigned. Burstein had served as Crysler's assistant. As previously noted, Crysler had responsibility for fixed income as well as common stocks. The position of assistant to Crysler involved, in addition to assisting on fixed income investments, some direct placement work with large utility companies.

47. Wajda applied for both Burstein's and Angevine's positions. Although Crysler felt that Wajda lacked the immediate qualifications for Burstein's position as his assistant, he was willing to train her. Both Crysler and Yoder felt that if Wajda were trained by Crysler, her prior experience in common stocks and direct placements in the 1950s and 1960s would give her the minimum qualifications to be an assistant officer in fixed income securities and utility direct placements. In conversations with Crysler, however, Wajda reiterated her desire to get back into direct placements, the area she believed provided her with the greatest career opportunities.

48. At this time (Fall 1977), Penn Mutual was undergoing a slow period in its cash flow, and Yoder, recognizing Wajda's long service to the Company and her desire to get back into direct placements, determined that it was an appropriate time to attempt to train her in this area even though she lacked requisite qualifications. However, because Wajda was so lacking in education and immediate experience in this area, it was clear that she lacked the ability to manage deals and, therefore, if she was to move to direct placements it would have to be as a security analyst and not as an assistant officer. Yoder discussed this with Wajda and also told her that if she was to go back to direct placements, she would have to take college courses and improve her interpersonal skills. Wajda agreed to these conditions.

49. Wajda was formally offered either the assistant investment officer's position in the fixed income division, or a security analyst position in direct placements. Wajda, adhering to her singleminded view that direct placements provided her with the greatest chance for success, decided to accept the security analyst position. This constituted a lateral job change for Wajda at the same salary she had been earning as an Equity Research Analyst and Trader. It did not represent a promotion.

50. Although she accepted the position as security analyst, Wajda considered that

the downgrading of that position from Investment Officer to security analyst was a discriminatory act and was in retaliation for her filing the EEOC charge. (Exhibit D6). I reject this contention and find that the downgrading of the position was due to Wajda's lack of qualifications for assistant officer status in direct placements. The offer of the security analyst position in direct placements to Wajda, in light of her lack of formal education or immediate experience, together with the understanding that she had to be trained, was the equivalent of the position of a college trainee, but at the much higher security analyst salary. Rather than being retaliatory or discriminatory, I find that Penn Mutual's action in offering her this position was an accommodation to her desire to get into direct placements and represented an exception to Penn Mutual's policy of hiring only college graduates in its training program.

51. When Wajda rejected the assistant investment officer position in fixed income securities, the Company posted the position within the company and Thomas H. Goddard applied for it. This was the first time an officer's position had been posted in the Company. Goddard, who had theretofore been employed in Penn Mutual's personnel department as Manager of Employee Compensation, and who had been with Penn Mutual since 1965, held a BS in Business Administration from Lafayette College where he had taken numerous courses in economics, finance and accounting. In addition, at the time he moved to the Securities Department, Goddard had earned 15 credits toward his MBA at Temple University. This course work, however, was directed primarily toward organizational behavior and personnel management. Although Crysler realized that Goddard lacked investment experience and that he would need to be trained, (as did Wajda), he offered the position to Goddard. On January 8, 1978, Goddard was appointed assistant investment officer in fixed income securities.

52. Goddard, as did Wajda when she transferred to direct placements, was allowed to transfer at the same salary he was earning as Manager of Employee Compensation. At Penn Mutual, exempt level positions were rated on an alphabetical scale, with each letter denomination signifying the range of salaries available for a particular position. Because the levels set ranges of salaries, the upper range of one level could be higher than the lower range of the succeeding alphabetical level. Goddard's situation was a case in point. When Goddard left Personnel, his job there was rated at a K level. His new position as an Assistant Investment Officer was a J level position. Goddard's salary at the K level was within the upper J level range and he was allowed to retain his then salary when he transferred. In order to remain within the allotted salary for the Assistant Investment Officer position, however, Goddard was required to forego the annual salary increase that he had been slated to receive in December of 1977.

53. A direct placement transaction normally developed along the following lines.

(a) A broker from outside Penn Mutual would contact an Investment Officer within the company to explore the possibility of Penn Mutual providing financing to the broker's corporate client. If the Investment Officer was interested in the deal, the broker would submit a proposal containing data about the corporation seeking financing. This data was then screened by a security analyst who, using any other available information, would prepare a report known as a screen, which outlined the applicant's financial history and present financial condition. The analyst and the officer would review the screen and decide whether to proceed further with the transaction. The officer-analyst discussion of the screen was considered to be an indispensible training tool for analysts. It was at this stage that the officer could best educate the analyst on the strengths and weaknesses of a particular transaction and discuss strategic approaches to issues raised by the hard data provided in the screen. The input that an analyst had at this stage was a function of the analyst's ex-

perience and each officer's willingness to delegate decisionmaking tasks to the analyst.

(b) If the officer and analyst determined that the screen warranted additional expenditure of effort, they would visit the applicant to obtain first-hand knowledge of the operations of the company and to give "life" to the hard data that they already possessed. On these trips modifications in the proposed financing were negotiated. For example, because most direct placement loans at Penn Mutual were unsecured, in these negotiations Penn Mutual might insist on a number of restrictive covenants and conditions precedent before agreeing to the financing and/or might insist on obtaining an equity interest in the corporation as a condition to granting the loan.

(c) Upon returning to Penn Mutual, if the officer was satisfied with the negotiated terms, the analyst would prepare a report to be presented to the Company's investment committee. The officer, of course, had final editorial control over the analyst's report. The officer (or the analyst, if the officer thought he or she was sufficiently experienced) presented the report to the investment committee, which either approved or rejected the transactions or directed the officer to engage in further negotiations.

54. Before an analyst could be promoted to an assistant officer in the direct placement area, it was required that the analyst be able to do straightforward small deals on his or her own. In order to perform such deals, it was essential that the analyst be aware of and understand the technical and analytical concepts behind corporate finance (such as covenants and equity kickers). In addition, the analyst had to possess sufficient interpersonal skills, both oral and written, to communicate with the investment committee and to negotiate with prospective clients.

55. When Wajda joined the direct placement division in November 1977, she was assigned to work with Weymouth, and Brown was shifted back to DuPont's team.

Prior to Wajda's arrival, Yoder informed Weymouth about Wajda's litigation and instructed him not to mention it to her.

56. Weymouth's goal in training Wajda was to prepare her to eventually be able to assume officer responsibilities in direct placements, but he considered Wajda's educational background wholly inadequate to perform the function of security analyst. Accordingly, at the time of her arrival in direct placements, or shortly thereafter, he suggested that she attend some investment seminars which were offered by the insurance and investment industries. Wajda agreed, and she attended at least one private placement seminar in New York in June of 1978. In mid-1978 Weymouth suggested that Wajda return to school part time at company expense to obtain her bachelor's degree. Although Wajda agreed to continue her education, she did not do so, contending that she was too busy preparing for her court case to go back to school.

57. Soon after Wajda's arrival it became evident to Weymouth that Wajda's knowledge of direct placement financing was so lacking that her training would have to start at "base one". For example, she had no knowledge or understanding of covenants (an important financing tool) and she was totally unskilled in the areas of negotiation and loan evaluation. In the beginning, Wajda was receptive to criticism and was enthusiastic about learning her new job. She performed very well routine tasks assigned to her.

58. In January 1978, Weymouth and Wajda travelled to Boise, Idaho on a proposed deal. Wajda testified that on this trip Weymouth threatened that she would lose her job if she lost her discrimination suit, and that he also told her that it would be advantageous to Weymouth's career if she dropped the suit. I reject this testimony and credit Weymouth's testimony that he made no such threats or comments in Boise or at any other time.

59. In April 1978, Wajda and Weymouth set forth objectives to be met by Wajda in that year. Setting of goals was part of Penn Mutual's Management by Objective

Program (MBO). Among the objectives that Weymouth designed for Wajda were that she be able "to assist officers and to actively participate in the investment of company funds...." and to be able to "assist investment officers and to participate in reviewing and maintaining the direct placement portfolio during the year." (Exhibit D14). To achieve these objectives Weymouth decided that Wajda would generally have to, *inter alia*, prepare investment reports and documents within 24 hours after they were requested. Wajda felt that the imposition of these deadlines was unfair, discriminatory, and retaliatory and she strenuously objected to their inclusion in her MBO form. Ultimately she attached her objections in writing to the form.

I find that the time deadlines set by Weymouth were legitimately related to Weymouth's goal to have Wajda accept increasing responsibility and achieve career advancement in direct placements. I find that Weymouth was sincere in his efforts to properly train Wajda. He did not set unrealistic objectives or expectations for Wajda to meet as a subterfuge for discrimination or retaliation.

60. Wajda's training with Weymouth continued throughout the remainder of 1978 and into spring of 1979. Although she generally performed her routine tasks very well, she was not able to make the necessary judgments concerning investments because of her difficulty in identifying the major points in investments, and deficiencies in her analytical ability. (Exhibit D13). On a number of occasions Wajda made major omissions in loan reports jeopardizing the successful culmination of the deals. Accordingly, in January 1979, when Weymouth evaluated Wajda's performance for 1978, it was his opinion that she was not qualified for promotion to assistant investment officer.

61. Company policy required that the employee sign the evaluation and place any disagreements in writing in a space provided on the evaluation form. Pursuant to this policy Wajda signed her 1978 evalua-

tion but added in writing that some of Weymouth's criticisms of her were based on a "campaign critique [which] was instigated following meeting of Loesche, Yoder, DuPont and Weymouth on Monday, 10/23/78." (Exhibit D13). Although the above named persons met on that day, I credit Weymouth's testimony that Wajda was not discussed and her claims of a group effort to criticize her were groundless.

62. I find Kent Weymouth to be very credible and that he was sincere in his desire to help Wajda advance and succeed in her career goals. His appraisal in January 1979 that Wajda was not yet qualified for officer status was not attributable to discriminatory or retaliatory motives. Wajda was simply not qualified to be an officer in direct placements because she lacked the knowledge or experience to competently negotiate and manage even the simplest deals.

63. In addition, by early 1979, Wajda was difficult to get along with because of her perception that she was being discriminated against. After a number of run-ins with personnel in the Securities Department, Wajda agreed to take an interpersonal skills seminar to improve her ability to get along with people.

64. By April of 1979, relations between Weymouth and Wajda had so deteriorated that Weymouth felt that he could no longer work with her. Wajda was unable to accept constructive criticism, perceiving discrimination at every turn, and Weymouth felt that no learning was taking place. Accordingly, in April, Yoder decided to transfer Wajda to DuPont on a temporary basis.

65. Wajda worked directly under DuPont until August or September 1979. DuPont regarded Wajda's overall performance as very good, but, consistent with Weymouth's views, DuPont considered that she was not yet able to assume management of loan portfolios and she lacked knowledge of fundamental financing transactions. (*See* Exhibit D15). Wajda signed DuPont's evaluation of her, again noting her objections. I credit DuPont's testimony and find that his evaluation of Wajda was justified and was not motivated by discriminatory or retaliatory considerations.

66. Miller retired in July 1980 and DuPont succeeded him as 2d Vice President-Corporate Loans. Wajda applied to succeed DuPont as leader of his direct placement team, an investment officer position. Wajda, for the reasons stated previously, lacked the ability to negotiate and manage direct placement transactions and was not offered the position.

67. The officer position was filled by Joseph E. Vardaro, who had theretofore been employed for six years by Monumental Capital Management, Inc. where he served as assistant vice president in charge of that firm's private placements. Vardaro held an MBA from New York University in finance and a BA from Villanova University in economics. Vardaro was far more qualified than Wajda for the position of assistant investment officer in charge of a direct placement team.

68. Shortly after Vardaro arrived, he assumed responsibility for training Wajda who was on his direct placement team. Vardaro soon found, as had Weymouth and DuPont before him, that Wajda had difficulty identifying salient points in prospective investments. For example, a borrowing company had broken a number of covenants in a loan agreement it had entered into with Penn Mutual. Vardaro and Wajda met with officials of that company to determine how to cure its default. At the meeting, Wajda focused on minor details, angering the borrowing company's personnel and thereby jeopardizing amicable resolution of the dispute.

69. Wajda continued to perceive discrimination at every turn while she worked for Vardaro. On one occasion, in a lobby in the presence of approximately ten people, she publicly accused Weymouth of discrimination. In addition to publicly commenting on discrimination, Wajda attempted to editorialize about her perceptions of discrimination on business reports that she and Vardaro had to fill out.

70. In early 1980 Wajda was made a senior investment analyst. This was simply an upgrading of her position to keep it competitive with others in the industry in similar positions with similar tenure, and did not involve a change in responsibility. Although this job classification was in use in other departments, Wajda was the first senior investment analyst in the Securities Department.

71. On a Monday morning in early November 1980, Vardaro and Wajda met to discuss Vardaro's evaluation of her performance for the period from January 1, 1980 to November 1, 1980. Wajda's overall rating on this evaluation (on a descending scale of outstanding, very good, fully competent, below average and unacceptable) was very good. (Exhibit P19). Wajda, however, vigorously objected to a number of comments Vardaro made in the evaluation. In particular, she was angered that Vardaro had rated her leadership ability as below average and that he wrote that Wajda needed "to guard against making negative comments about Penn Mutual, which affect department morale." (*Id.* at p. 5). Vardaro agreed to make a number of changes that Wajda suggested, including changing the above quoted language to "which could affect department morale." Wajda was not satisfied by this change, however, and refused to sign her evaluation as required by the company. Although Vardaro advised her that she could add whatever comments she deemed appropriate to the evaluation, Wajda refused to sign, asserting that if she signed the evaluation, the negative comments would be used against her in her court case.

72. When Wajda persisted in her refusal to sign the evaluation, Vardaro and Wajda went to Weymouth, who told Wajda that she was required by company policy to sign the evaluation. Wajda angrily refused.

73. Wajda, Weymouth and Vardaro went to Yoder and told him of the problem. Yoder reiterated that Wajda was obligated to sign the evaluation, but she still refused, repeating her claim that the evaluation would jeopardize her court case. Wajda was very upset during the meeting in Yoder's office, shouting, crying and banging on Yoder's desk. She accused Vardaro of being biased and out to get her and at-

tacked Vardaro's integrity. The meeting in Yoder's office broke up without Wajda signing the evaluation.

74. Yoder brought the matter to the attention of John Tait, who had replaced Loesche as Financial Vice President earlier in the year. Yoder recommended to Tait that Wajda be terminated from the Securities Department. Tait took the matter under advisement.

75. Wajda was scheduled to go on a trip with Vardaro and DuPont later that day. In light of what had transpired earlier, DuPont, who considered Wajda's behavior that day as inconsistent with the team concept, informed Wajda that she could not go on the trip.

76. On the trip Vardaro informed DuPont that, in light of Wajda's accusations, he could no longer work with her.

77. Upon returning to Penn Mutual, DuPont recommended to Tait that Wajda be removed from direct placements, and Tait, who already had a similar recommendation from Yoder, concurred. On November 13, Tait told Wajda to go home for a few days. On November 24, 1980, Tait, Yoder, and Gwen Jones and Lester Talbot of the affirmative action office of the personnel department decided that, in light of what had transpired, Wajda could no longer continue to work in the small Securities Department. Tait informed Wajda of his decision and that she should go home while Talbot attempted to find a position for her elsewhere in the Company.

78. The decision to remove Wajda from the Securities Department was fully justified. Wajda, by continuously charging discrimination and refusing to accept constructive criticism, had alienated the department's personnel to the extent that no one would work with her. Her refusal to sign the evaluation and to put her objections in writing constituted insubordination and was in clear violation of company policy. I find that Wajda was not removed from the Securities Department on account of her sex and was not removed in retaliation for exercising her rights under Title VII.

79. During her tenure in the direct placement division, Wajda was not denied promotion on account of her sex. Her failure to achieve assistant investment officer status was because of her lack of qualification for that position. At no point in her tenure did Wajda show that she had the ability to analyze, structure, negotiate, and manage loans on her own, abilities which were essential to the position of assistant investment officer in direct placements.

80. During her tenure in direct placements, no adverse actions were taken against Wajda in retaliation for her exercising her rights to bring charges under Title VII. I find that those persons with whom she worked made a sincere effort to train Wajda. The difficulties Wajda had in learning in this area stemmed from her failure to live up to her agreement to further her education and her tendency to reject constructive criticism as motivated by discrimination.

81. In December 1980, Talbot informed Wajda that he was unable to find her a comparable job and gave Wajda the option of termination, early retirement or taking a lower paying job. Wajda did not wish to retire and said she would take whatever was available. Throughout December and into the spring of 1981, during which periods she continued to receive her salary, Wajda received the company job postings (Exhibit P29) from Talbot but did not respond to them. Although some of these postings, such as janitorial positions, were clearly unrealistic job opportunities, I find that there were other opportunities, such as clerical positions, which Wajda might have explored as an alternative until a comparable position became available.

82. On April 17, 1981, the company informed Wajda that since no job could be found for her, she was to be terminated effective July 31, 1981.

83. Wajda was terminated from Penn Mutual because there were no positions comparable to her position as senior security analyst. Despite her claims to the contrary, Wajda showed her unwillingness to accept a lower paying position by failing to

respond to job opportunities offered to her. I find that Wajda was not terminated from Penn Mutual on account of her sex nor was she terminated in retaliation for exercising her rights under Title VII.

84. At the time of Wajda's termination the direct placement division of the Securities Department consisted of DuPont, Weymouth, Vardaro and Barbara Harris. Harris had been hired as an investment analyst trainee, replacing J. Gary Brown on February 26, 1979. She was promoted to investment analyst in the spring of 1980. Harris worked with Weymouth's team after Weymouth and Wajda were unable to get along.

Wajda was replaced in direct placements by Sarah C. Lange, a newly hired investment analyst.

85. The statistical proof offered in this action was not at all impressive. The statistics offered by plaintiff do not establish that Penn Mutual engaged in a pattern and practice of discrimination in promotional or salary opportunities during 1972–1980. While plaintiff has shown that there was a far greater number of male officers in Penn Mutual than female officers during this period (Exhibit P–22), plaintiff's statistics do not address the relative probabilities for promotion between men and women. If anything, the evidence indicates that the number of females promoted in this time period was approximately that which could be expected if women and men had the same probability of being promoted. (Exhibits D19 and D20). Further, between 1971 and 1980, women's salaries increased at a greater rate than did men's (Exhibit D–21), and men and women had the same chance of reaching exempt level salaries. (Exhibit D–22).

## DISCUSSION

■ In this Title VII action, plaintiff contends that Penn Mutual discriminated against her on account of sex during the forty years that she was employed by the company, and that Penn Mutual retaliated against her for exercising her rights under Title VII. Although much of plaintiff's evidence at trial related to events and acts occurring between 1940 and 1972, it is clear that in order to establish liability plaintiff had the burden to prove that Penn Mutual discriminated against her during the applicable limitations period. *Croker v. The Boeing Co.*, 662 F.2d 975, 989–90 (3d Cir. 1981) (en banc); *Jewitt v. International Telephone and Telegraph Corporation*, 653 F.2d 89, 90 (3d Cir. 1981). Because Pennsylvania is a deferral state requiring submission of claims to state agencies prior to the filing of a charge with EEOC, plaintiff was required to file her charges of sex discrimination with EEOC within 300 days of the practice or practices which serve as the basis of her charge. 42 U.S.C. § 2000e–5(e); *Mohasco v. Silver*, 447 U.S. 807, 814 n.16, 100 S.Ct. 2486, 2490 n.16, 65 L.Ed.2d 532 (1980); *See Davis v. Calgon*, 627 F.2d 674, 676 (3d Cir. 1980). Here, although plaintiff presented her charge to EEOC on September 11, 1973, EEOC was required by law to defer to the state agency for 60 days, and, therefore, as a matter of law the charge was not filed until November 10, 1973. *Mohasco v. Silver, supra.* Accordingly, in order to establish liability in the instant case, Wajda had to prove that she was a victim of purposeful discrimination at some point after January 14, 1973, which is 300 days prior to the filing of her EEOC charge.[5] *Croker v. The Boeing Co., supra; Jewitt v. International Telephone and Telegraph Corporation, supra.* Absent proof of Title VII violations after January 14, 1973, discriminatory events occurring prior to that date are simply not actionable. *Id.* at 93. As the Supreme Court stated in *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)

---

**5.** At trial plaintiff contended that the applicable date was November 15, 1972 or 300 days prior to the time Wajda presented her charge to EEOC. Plaintiff's calculation, however, fails to take into account the 60 day deferral period which precludes a charge from being filed with EEOC until the expiration of that period. *Mo-* *hasco v. Silver, supra.* It should be pointed out, however, that in the instant case this issue is irrelevant, since, regardless of which date is applied, plaintiff has not established that she was discriminated against and she is not entitled to relief.

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

■ Wajda contended that Penn Mutual discriminated against her after January 14, 1973 (or applying plaintiff's suggested date, November 15, 1972) by denying her the chance to transfer to direct placements, by failing to promote her to an officer position and by retaliating against her for filing a charge of discrimination with EEOC. Wajda's claim is one of disparate treatment, and accordingly, plaintiff had the ultimate burden of proving by a preponderance of the evidence that Penn Mutual purposefully discriminated against her. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Croker v. The Boeing Co., supra*, at 990–91.

In *Burdine* the Supreme Court directed that the most expeditious way to determine whether a plaintiff has satisfied her ultimate burden of proving purposeful discrimination is by applying the series of intermediate burdens first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). 450 U.S. at 252–253, 101 S.Ct. at 1093. As restated in *Burdine* :

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscrimatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. at 252–253, 101 S.Ct. at 1093, *quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Here, as part of her prima facie case, plaintiff had to establish by a preponderance of the evidence that she was qualified for the promotions and job opportunities that she claims were denied her. *McDonnell Douglas Corp. v. Green, supra*, at 802, 93 S.Ct. at 1824; *Jewitt v. International Telephone and Telegraph, supra*, 653 F.2d at 91. As is evident from the foregoing findings of fact, plaintiff was not qualified for promotion to assistant investment officer while she was in either the common stocks or direct placement divisions. In reaching this conclusion, I rejected plaintiff's contention that promotions to assistant investment officer in those areas were simply a function of length of tenure and that no specific qualifications were required. Instead, I found that in both common stocks and direct placements, the ability, whether manifested by formal education or practical experience, to analyze and decide on potential investments was essential to promotion to assistant investment officer. In common stocks, an assistant investment officer had to be able to select stocks and manage a portfolio, while in direct placements, an assistant investment officer had to be able to analyze, negotiate, structure and manage loan transactions. Every person who attained the assistant investment officer position in these divisions during the applicable period manifested these abilities. The evidence established that Wajda lacked the practical ability or formal education to perform the analytical functions of an assistant investment officer and, accordingly, she has failed to establish a prima facie case that she was denied promotional opportunities.[6]

---

**6.** The fact that Wajda, and later Goddard, were offered the assistant investment officer position in fixed income securities without experience or education in that area does not support Wajda's claim. According to Crysler the person who filled that position would be his assist-

Insofar as job opportunities are concerned, Wajda is not entitled to relief on the ground that she was denied the common stock portfolio management positions filled by Hoffman and Lindberg. First, as already noted, Wajda was not qualified for these officer positions and she has not proven a prima facie case. Second, even assuming that she was minimally qualified, Hoffman and Lindberg were far more qualified than she for the positions. Whether plaintiff has to prove that she was more qualified than those selected as part of her prima facie case, *see Jewitt v. International Telephone and Telegraph Corp., supra,* 653 F.2d at 91 (1981), or whether filling the position with a better qualified person is merely an articulated legitimate business reason for the decision, *see Holder v. Old Ben Coal Co.,* 618 F.2d 1198, 1203, 1204 (7th Cir. 1980) (Swygert, J., dissenting), is academic.[7] Wajda did not persuade me that Penn Mutual's articulated reason for hiring Lindberg and Hoffman, *i.e.,* that they were more qualified, was a pretext for discrimination. Accordingly, plaintiff is not entitled to relief under Title VII for denial of job opportunities in common stocks. *See Page v. Bolger,* 645 F.2d 227, 230 (4th Cir. 1981) (en banc).

Plaintiff also contends that she was denied job opportunities in direct placements. For the reasons stated in the preceding discussion concerning the Lindberg and Hoffman positions, Penn Mutual did not violate Title VII by denying plaintiff the positions ultimately filled by DuPont, Weymouth and Vardaro. Wajda was not qualified for these positions, which involved analyzing, structuring, negotiating, and managing loan transactions, but even assuming arguendo that she was minimally qualified, Weymouth, Vardaro and DuPont were far more qualified than she.

Wajda also contended that she was discriminated against by not being allowed to transfer into direct placements until 1977, and by the fact that when she was allowed to transfer, it was as a security analyst and not as an officer. Although plaintiff communicated her desire to return to direct placements as early as 1972, the only opening, other than DuPont's and Weymouth's, in that area prior to 1977 occurred in 1975 when J. Gary Brown was hired as a college trainee. Plaintiff did not ask to be considered for this position since the salary level was significantly lower than her own. However, even if I were to accept plaintiff's argument that she should have been considered for the position and allowed to transfer at her then salary, Brown, who had recently obtained a BA degree in finance and accounting, was more qualified for the trainee position than Wajda.

Further, Penn Mutual did not discriminate against Wajda by offering her a job in direct placements as a security analyst. Wajda entered the department as a trainee although she was paid as an analyst, and the fact that she was allowed to do so despite her lack of academic qualifications was an accommodation to her by the company and an exception to its policy of only hiring college graduates as trainees. She did not have the qualifications for an officer's position in direct placements and, indeed, it is highly questionable if she had the qualifications to even be a security analyst in 1977. Accordingly, the offering of the job to her as a security analyst and not as an officer was not a violation of Title VII.

Finally, plaintiff contends that, in violation of 42 U.S.C. § 2000e–3(a),[8] she was fired from the Securities Department and from Penn Mutual in retaliation for having filed the charge of employment discrimina-

---

ant and Crysler felt that he could personally train someone to fill the position. Crysler made clear that no great financial expertise was required for the fixed income position.

**7.** Since *Burdine,* the defendant does not have the burden of establishing that the person selected was more qualified than the plaintiff. 450 U.S. at 258–259, 101 S.Ct. at 1094.

**8.** Plaintiff also contends that she was subjected to unjust criticism in retaliation. As the findings of fact make clear, any criticism that Wajda received was justified and was not motivated by retaliatory purposes.

tion with EEOC. Plaintiff satisfies her burden of establishing a prima facie claim of retaliation by showing that she engaged in protected activity and that she was subjected to adverse action which can be causally linked to the exercise of the protected activity. *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980); *Hochstacht v. Worcester Foundation, Etc.*, 425 F.Supp. 318, 324 (D.Mass.1976). As with standard claims of sex discrimination, plaintiff's proof of her prima facie case simply places, the burden on defendant to articulate a legitimate business reason for its action. The ultimate burden of establishing that the reason is pretextual rests with plaintiff.

There is no dispute that plaintiff engaged in protected activity under Title VII and she suffered adverse employment action by being terminated from her position. Her termination, however, occurred more than seven years after she filed her claim with EEOC and more than four years after she filed the instant suit. The only evidence of retaliation in this case is Wajda's testimony that Weymouth threatened her, but I did not credit that testimony. Despite the attenuated causal relationship between Wajda's termination and her protected activity, I will assume the existence of a prima facie case of retaliation. Notwithstanding this assumption, plaintiff did not prove that she was discharged in retaliation for exercising her rights under Title VII. Penn Mutual's articulated reason for Wajda's discharge, *i.e.*, that her contentious personality which culminated in the blow up with Vardaro made her continued presence in the department intolerable, is certainly a legitimate justification for her discharge from the Securities Department. *See Nance v. Union Carbide Corporation*, 540 F.2d 718, 727 (4th Cir.), *cert. denied*, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1976); *Gonzalez v. Bolger*, 486 F.Supp. 595, 601 (D.D.C.1980), *aff'd mem.* 656 F.2d 899, 28 Fep. Cases 1752 [BNA] (D.C.Cir.1981).

The reasons given by Penn Mutual are not pretextual, as Wajda's behavior was indeed intolerable. By the time she was terminated, she had alienated everyone in the Securities Department by constantly misconstruing constructive criticism as discrimination and by impugning the integrity of her superiors and the Company as a whole. Efficient operation of the Securities Department required a good relationship among the relatively small number who worked there. Wajda, by impugning the integrity of others in the Department, disrupted it and simply made it impossible for her to continue to work there.

Further, Wajda's reaction to the evaluation which led to the final blow up was irrational and her refusal to sign the evaluation was outright insubordination. She had received a very good evaluation from Vardaro, nevertheless obsession with her lawsuit forced her into a confrontation which ultimately led to her dismissal. Whatever merit there may have been to Wajda's objections to Vardaro's comments (and I believe there was none), she could have preserved them by simply noting them in writing on the form, a practice she had followed in the past. Instead, she persisted in telling her supervisor how to do his job, and refused to allow him to honestly appraise her. When she refused to follow company policy and, in the process, made accusations of discrimination against her superiors who had correctly advised her as to the proper way to register her objections, her termination from the Securities Department was justified.

I am persuaded that, rather than taking retaliatory action, Penn Mutual did all it could to accommodate Wajda's career goals after she filed her EEOC complaint.[9] Wajda was given job opportunities for which she lacked the education or experience. Penn Mutual was willing to make the effort to train her to compensate for her lack of qualification, but Wajda failed to cooperate. She did not further her education and she was unreceptive to the good faith training efforts made by others. I am convinced, therefore, that Penn Mutual's articulated reason for terminating Wajda was not pretextual, and Wajda has not established that

---

**9.** This accommodation began even before Penn      Mutual learned of the filing of the complaint.

Penn Mutual retaliated against her in violation of Title VII by terminating her from the Securities Department.

Finally, Wajda has not established that her termination from all employment with Penn Mutual was in retaliation for exercising her rights under Title VII. When no comparable job was available, Wajda indicated that she would take a lower paying one, but she failed to respond to the several job opportunities supplied to her. Considering that her leave of absence was occasioned by her insubordination, which alone would have justified her termination from the Company, Penn Mutual has no obligation to pay her forever. Accordingly, I conclude that Penn Mutual's articulated reason for terminating her from the company, *i.e.*, that no job could be found for her, was not pretextual and plaintiff is not entitled to relief on any grounds stemming from her termination from the Company.

## CONCLUSIONS OF LAW

1. Subject matter jurisdiction of plaintiff's claim of sex discrimination is pursuant to 42 U.S.C. § 2000e–5(f)(3). Although plaintiff did not file the claims of retaliation with EEOC, this court has ancillary jurisdiction over such claims. *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir. 1981).

2. Plaintiff has failed to establish that defendant purposefully discriminated against her on account of sex in violation of Title VII in the period of time after January 14, 1973.

3. Plaintiff has failed to establish by a preponderance of the evidence that she was denied promotional opportunities on account of her sex in violation of Title VII after January 14, 1973.

4. Plaintiff has failed to establish by a preponderance of the evidence that she was denied job opportunities after January 14, 1973 on account of her sex in violation of Title VII.

5. Plaintiff has failed to establish by a preponderance of the evidence that she was terminated from employment or that any adverse action was taken against her in retaliation for her engaging in protected activity under Title VII.

6. Plaintiff has not established that Penn Mutual engaged in a pattern or practice of discriminating against women in job opportunities or promotions after January 14, 1973. Accordingly, plaintiff is not entitled to rely on the effects of such purported pattern or practice to justify relief in the instant case. *Jewitt v. International Telephone and Telegraph Corporation*, 653 F.2d 89, 92 (3d Cir. 1981).

7. Plaintiff is not entitled to relief under Title VII, 42 U.S.C. § 2000e, *et seq.*, and defendant is entitled to judgment in its favor.