**Nestor GONZALEZ, Plaintiff,**

v.

**William F. BOLGER, Defendant.**

**Civ. A. No. 78–2226.**

United States District Court, District of Columbia.

March 7, 1980.

---

Gary H. Simpson, Bethesda, Md., for plaintiff.

Whitney M. Adams, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

Plaintiff, a United States citizen of Puerto Rican national origin, was employed as a distribution clerk at the Washington, D. C., Post Office until his termination in May, 1978. He brings this action against his former employer, alleging that he was discharged unlawfully in retaliation for his exercise of rights protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (1976) ("the Act"). Following his pursuit of administrative relief, he now seeks from this Court reinstatement, monetary damages, and a broad injunction to prevent similar future reprisals. The Court has jurisdiction under 42 U.S.C. § 2000e–5(f) and –16.[1]

After plaintiff filed his complaint *pro se* and was served with discovery requests, the Court appointed counsel to represent him. Subsequently the complaint was amended bringing plaintiff's claims into sharper focus, and discovery proceeded in timely fashion. A trial having been held and post-trial briefs submitted by able counsel on both sides, the Court now issues this Memorandum Opinion, constituting its findings of fact and conclusions of law.

---

1. Plaintiff also alleges a cause of action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"). The Court's jurisdiction is established under 5 U.S.C. § 704 as well as Title VII. The evidence at trial, however, was presented almost exclusively in terms of Title VII, and it is so treated in the Court's opinion. Appropriate conclusions of law under the APA claim are addressed at note 4, *infra*.

## I.

Plaintiff was employed by the United States Postal Service in January, 1971, as a temporary distribution clerk at the Washington, D. C., Post Office. Following two years at a smaller office in suburban Maryland, he returned to the Main Post Office at North Capitol Street and Massachusetts Avenue, N.E., ("Main Post Office") in January, 1973. Subsequently he was assigned to handle incoming mail on a shift extending from 3:30 p. m. until midnight. He worked under various floor foremen and tour superintendents who in turn reported to an administrative foreman, Mr. Major Campbell.

Incoming mail is sorted on an assembly line basis by employees working side by side under tight supervision and time constraints. It was the practice to shift employees from their principal assignment to other related duties on an emergency basis in order to meet manpower needs. During the period at issue, plaintiff, like others, was so assigned temporarily from time to time. As a consequence, he came under the supervision of different foremen in different units. Campbell, as plaintiff's administrative supervisor, was responsible for keeping plaintiff's attendance records and informing him of new management policies.

Although his early work performance at the Main Post Office was for the most part acceptable, plaintiff was at times the subject of disciplinary action related to his poor attendance record. In late 1976, prior to his assignment to a unit supervised by Campbell, plaintiff was given a 28-day suspension as a result of being AWOL for over 1800 hours. According to plaintiff this absence related to an alleged injury that was not confirmed by a timely medical report from his physician.

The Washington, D. C., Post Office employs some 7000 men and women, of whom 400–500 occupy supervisory positions.

In mid-1977, plaintiff and five other Postal Service employees at the Main Post Office formed a Committee to Humanize the Postal Service ("CHPS"). Through periodic newsletters, press releases, and occasional meetings, CHPS members voiced a range of grievances based on claims of degrading and discriminatory treatment of employees by Postal Service management. Plaintiff was particularly agitated because he felt that discipline was meted out more harshly to Spanish-surnamed individuals than to Caucasians. Although available data does not establish the alleged gross disparity in disciplinary treatment, there is sufficient evidence in the record from the 1976–77 period to establish as reasonable plaintiff's belief that Hispanics were subject to harsher discipline than whites at the time. Plaintiff actively asserted his own perceived grievances and became a vigorous champion of black as well as Hispanic grievants, frequently acting upon request as their EEO representative.

During early and mid-1977, the Washington, D. C., Post Office, through its Director of Employee Labor Relations, Mr. Carmen Errico, issued a series of memoranda regarding its policies for according "official time" (i. e., on-duty release time) to employees and their representatives who wished to prepare and present EEO complaints. These memoranda purported to follow standards set forth in the applicable Civil Service regulations, now codified at 29 C.F.R. § 1613.214(b) (1979).[2] Under the Errico policy statements, EEO complainants and·their designated representatives were allowed a "reasonable amount of official time" to participate in the actual filing of a complaint with an EEO counselor, but were not permitted "on-the-clock time" for preliminary discussions between a prospective complainant and his or her representative or for other aspects of complainant's formulation of his or her formal complaint. CHPS members criticized the latter feature of Errico's policy, insisting that Civil Service regulations and Postal Service instructions required a complainant and his or her representative to be given liberal time off the clock in the initial pre-complaint stages of an EEO matter. Direct correspondence between CHPS and the Civil Service Com-

---

2. The former codification was at 5 C.F.R. § 713.214(b).

mission resulted in letters, later discounted at trial by the Commission, which appeared to support the CHPS members' position.[3]

Post Office authorities continued to believe there was no requirement to grant a complainant or a representative time off the clock prior to the filing of a formal EEO complaint. In practice, however, this policy was not always strictly enforced. When the volume of incoming mail was not excessive, employees would often be allowed official time for complaint preparation so long as the requesting employee notified his. supervisor as to his precise whereabouts or checked in periodically to see if he was needed on the workroom floor. Much depended on the attitude of a given foreman at the moment.

Campbell, as plaintiff's administrative supervisor, was not unsympathetic to plaintiff's EEO concerns. He advised various foremen and superintendents for whom plaintiff worked that plaintiff should be released to pursue EEO matters when the workload was not too heavy. Plaintiff benefitted from this more relaxed practice. He filed innumerable requests for official time to prepare to present EEO complaints on behalf of himself and others. On some occasions, he was given extended periods of release time for complaint preparation with the proviso that he check in as described above. On other occasions he was refused. However, he was never refused time off when a complaint was imminently to be filed or an appointment had been scheduled with an EEO counselor or investigator.

When plaintiff's requests for release time to prepare a complaint were denied he was refused because not authorized by the Errico policy or on grounds of excessive workload. The formal Errico policy was based on Errico's belief that allotting a "reasonable amount" of official time involved balancing employee rights against the necessities of efficient Post Office operation. Plaintiff deeply resented these denials, which he viewed as part of a concerted action by the Postal Service to foster race discrimination and stifle complainants.

Frustrated over the perceived uncertainty in defendant's application of official time policy, and fueled by a passion to vindicate employee rights, plaintiff initiated a relentless campaign in mid-1977 that ended with his termination in May, 1978. He kept up a steady stream of requests for release time, and virtually whenever a request was denied he would file a charge of reprisal against the foreman, superintendent, or other supervisor responsible. Often plaintiff did not follow up his charges; when he did he sought expedited processing, never requesting formal hearing on his complaints. His reprisal charges were forwarded for investigation. During this period, plaintiff filed between 40 and 80 complaints charging more than 20 different supervising officials with release time reprisals. Other CHPS members also requested release time for EEO matters and complained of reprisal when time was denied, but few approached and none exceeded plaintiff's rate of frequency regarding reprisal charges. None of plaintiff's reprisal charges was sustained by the agency.

Although plaintiff believed in good faith that Errico's policy violated applicable regulatory requirements, his opposition often was expressed in an intemperate or disruptive manner. On July 15, 1977, plaintiff requested release time from foremen Hill and Wills in order to prepare an EEO complaint for presentation. This request was refused by Tour Superintendent Albritton, who relied on his foremen's determination that plaintiff could not be spared due to heavy mail volume. Albritton understood the refusal of plaintiff's request to be consistent with Post Office policy issuances on release time. In the ensuing discussion, a further controversy arose concerning a safety issue unrelated to EEO matters. Plaintiff became loud and upset, and ultimately refused to return to his assignment despite instructions that he do so. This

---

**3.** For Postal Service instruction, see plaintiff's exhibit 7. For comments by Civil Service Commission, see plaintiff's exhibits 11, 12, 17. At trial, the Commission explained its letters as resulting from an incomplete understanding of the relevant factual circumstances.

incident was written up and reported to Campbell, who questioned plaintiff and others involved. Based on Campbell's recommendation, plaintiff was notified on August 10, 1977, of a two-week suspension effective August 24; he also was warned against similar disruptive conduct in the future.

Shortly thereafter, plaintiff requested release time for EEO preparation, and was told he could have one hour but should check back at the end of that time to see if he was needed on the floor. Plaintiff failed to return for more than two hours. His supervisor, who had previously given plaintiff release time for EEO matters, wrote up the incident. No disciplinary action was taken at the time. Several weeks later, plaintiff accompanied a prospective complainant to the EEO office to schedule a future counseling session. While in the office, he entered into a verbal altercation with an EEO counselor during which he used abusive and belligerent language. The counselor, who was upset by what she felt was plaintiff's unprovoked behavior, reported the incident. Campbell investigated both incidents, questioning plaintiff as well as other participants and witnesses. Based on these two incidents, plaintiff was again suspended for two weeks, effective October 12, 1977, and again warned.

Soon afterwards and following an injury on duty that kept him away from work for several months, plaintiff returned to the mailroom in mid-February, 1978. In early March, he lost his temper when a request for release time was denied due to a backlog of incoming mail. He subsequently left the floor for alleged health reasons, and the incident was not reported. On this and other occasions, Campbell attempted to counsel plaintiff, urging him to control his temper and seek appropriate EEO relief through peaceable channels.

In mid-March, plaintiff filed a number of grievances concerning his past denials of official time for EEO matters. On March 15, 16 and 17, Campbell approved four of plaintiff's requests totalling over six hours of release time to work on these grievances.

On March 17, Errico issued a new memorandum to his supervisors, instructing them to grant EEO representatives from five to ten minutes of official time to prepare for their complainant's initial meeting with an EEO counselor on the day of the meeting itself. This revision, while apparently providing more release time than Errico's prior official memoranda, allowed considerably less time than plaintiff thought he was entitled to or than his supervisors had countenanced in practice over preceding months.

On March 18, about one hour into his shift, plaintiff was refused permission for release time to prepare an EEO complaint. The supervising foremen on duty, Terry and Finney, were concerned about the heavy volume of mail left from the previous crew; at the same time they attempted to explain to plaintiff the new policy of March 17, and to discover whether a meeting with the EEO counselor was scheduled for that day. This was plaintiff's first knowledge of the new policy and he demanded that it be produced. Plaintiff became angry during the discussion, which also involved the Tour Superintendent, Pink. When the policy was not produced, plaintiff lost his temper, interrupted all explanations, and returned to his workplace but began taking notes, ignoring instructions to resume work. Throughout the rest of the day, plaintiff made repeated requests for release time and other forms of leave, became loud and boisterous when these requests were denied, and was unavailable to perform work duties for substantial periods of time. His adamant protests disturbed working conditions for many other employees on the floor, and were particularly disruptive to tasks performed at the end of the shift. Both Finney and Terry wrote up reports on plaintiff's conduct.

On March 19, a similar pattern of incidents was repeated, this time involving Foreman Watts and Tour Superintendent Scott, with Watts submitting a written report. Campbell, who observed plaintiff on several occasions taking notes at his duty station, warned him that he must return to his job duties. Plaintiff again failed to fulfill work responsibilities during much of

the day, and was agitated and abusive in his communications with supervisory personnel.

After receiving reports on these incidents and interviewing supervisors, Campbell recommended that plaintiff be removed for disrespectful conduct and failure to follow instructions. Plaintiff was on sick leave at this time, and Campbell did not talk with him before submitting his recommendation. The recommendation was approved by the Postmaster, pursuant to normal procedures, and plaintiff was terminated on May 8, 1978. He filed a reprisal charge challenging the termination, which was denied by the Postal Service on June 30. Plaintiff's appeal of the agency's termination decision led to a hearing before the Civil Service Commission in August, 1978; the Commission affirmed the agency's action in October, 1978.

## II.

Plaintiff claims that his entire course of conduct in the year preceding his removal was protected under section 704(a) of the Act, 42 U.S.C. § 2000e–3(a), which reads in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [t]he [employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

According to this theory, plaintiff was either penalized on various occasions because of his vehement opposition to defendant's unlawful official time policy, or he was eventually terminated in retaliation for his participation, as representative and complainant, in various protected EEO activities. In either instance, it is alleged, defendant's application of a policy it knew or reasonably should have known to be unlawful under 29 C.F.R. § 1613.214(b) is sufficient alone to establish a direct statutory violation. Thus plaintiff asserts that de-

fendant had a duty *not* to discharge an employee, such as plaintiff, for acting in violation of an illegal policy. Plaintiff urges that the fact of his termination establishes unlawful intent and that because the illegal policy on release time was a clear and substantial cause for plaintiff's dismissal, defendant's attempt at justification by referring to plaintiff's disruptive manner is purely pretextual.

Under defendant's theory, plaintiff has failed to establish even a *prima facie* case of discrimination. Defendant contends that in its practical efforts to balance considerations of individual participation and the collective need for efficiency it has lawfully applied the dictates of 29 C.F.R. § 1613.-214(b). In short, reasonable amounts of release time were granted and plaintiff's opposition to a lawful policy is in no way protected under section 704(a). Further, because there is allegedly no evidence that plaintiff's supervisors were aware of his EEO activism when reporting his disciplinary infractions, defendant contends that no retaliatory motive can be shown. Finally, defendant argues that plaintiff's repeated instances of disobedience, disrespect and disruption exceeded the tolerable limits of protected conduct even assuming his opposition stance to be justified.

■ When discriminatory treatment is alleged in a Title VII action, the Court must apply the familiar three-part test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this standard, plaintiff carries both the initial burden of establishing a *prima facie* case for discrimination, and the ultimate burden of showing that defendant's proffered explanation for its conduct is pretextual. *Id.* at 802–04, 93 S.Ct. at 1824. The judgment as to whether or not a defendant acted from legitimate motives is particularly troublesome where, as here, plaintiff's combative and disruptive behavior is closely associated with his exercise of protected rights.

■ Although Congress plainly intended to provide broad protection for individuals

who complain of an employer's discriminatory conduct, it is equally clear that such protection is not without limits. A court must balance the Act's goal of encouraging reasonably expressed opposition to employer discrimination against management's recognized prerogative to maintain internal discipline and a stable working environment. *See Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). *See also* H.R.Rep. No. 914, Part II, 88th Cong., 1st Sess. 29 (additional views), *reprinted in* [1964] U.S.Code Cong. & Admin. News, pp. 2355, 2516. Because plaintiff exceeded the limits of reasonable opposition activity on a continuing basis and his dismissal is attributable to these transgressions, the Court is forced to conclude that his termination was not pretextual, but rather was for valid non-discriminatory reasons.

■ At trial, plaintiff presented a *prima facie* case of retaliatory discrimination, by showing that he engaged in protected activities, that his employer was aware of the protected activities, and that he was subsequently discharged, within a relatively short time interval after his performance of the activities. This series of events is sufficient to enable a court to infer retaliatory motivation, absent further explanation from the employer. *See Brown v. Biglin*, 454 F.Supp. 394, 399 (E.D.Pa.1978); *Hochstadt v. Worcester Foundation for Experimental Biology*, 425 F.Supp. 318, 324 (D.Mass.), *affirmed*, 545 F.2d 222 (1st Cir. 1976).

■ Assuming *arguendo* that defendant's release-time policy does not violate Title VII, plaintiff's opposition to the policy remains presumptively a protected activity. Once plaintiff, acting for himself or as a representative, initiates pre-complaint contact with an EEO counselor, *see* 29 C.F.R. § 1613.213(a), or assists in the presentation of a formal complaint, *see* 29 C.F.R. § 1613.-214(b), he is participating in a Title VII proceeding. Such conduct is protected from

retaliatory discipline regardless of the merit of the EEO charges filed. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969). Plaintiff's informal counseling of prospective complainants who have yet to initiate EEO proceedings also merits protected status in this instance even if not classified under the "participation clause" of section 704(a). Without deciding whether or not the Post Office practice of selectively granting release time requests was in fact unlawful, plaintiff's testimony established his good-faith belief that the practice violated Title VII. Defendant's frequent attempts to clarify its position, and the Civil Service Commission's evident concern over the implications of the Errico memoranda establish that plaintiff's opposition was not unreasonable. Under these circumstances, it would defeat the remedial purpose of the Act itself to chill a good-faith employee protest by invoking the spectre of retaliatory action should the alleged violation objected to later be found not to exist. *See Berg v. La Crosse Cooler Co.*, 21 Fair Empl.Prac.Cas. 1012, 1015 (7th Cir. 1980); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).

Defendant's further contention, in opposition to plaintiff's *prima facie* case, that Post Office supervisors were ignorant of plaintiff's protected activities also is without merit. Plaintiff filed scores of reprisal complaints, and was granted release time on many occasions. Other employees complained regularly of release-time denials. This activism in EEO matters, both by individuals and by CHPS as an organization, was certainly known in some degree to Campbell, who made the ultimate recommendation of dismissal. Although several supervisors testified that they had no knowledge of EEO difficulties at the Main Post Office, their testimony is not wholly credited in light of other evidence.

■ In rebuttal, however, defendant presented substantial proof, through testimony and documentary exhibits, that plaintiff's insubordination and disruptive outbursts were in fact the cause for his termination. These reasons, if accepted on the

proof as a whole, would constitute a valid non-discriminatory explanation for defendant's action. It was shown at trial that plaintiff disobeyed direct orders on several occasions. He was disrespectful both in manner and language, to supervisors and also to EEO personnel. He deliberately disrupted the working environment when his demands were not met immediately. This behavior persisted over months, and in spite of periodic disciplinary measures as well as warnings and counseling aimed at curbing his outbursts. Plaintiff's militant self-help posture interfered with his employer's business objectives. It was in no way conducive to a frank exchange of ideas between employer and employee, and served no redeeming statutory or policy purpose. Plaintiff exceeded the tolerable limits of protected conduct. Absent a persuasive showing that defendant acted pretextually, the termination does not violate section 704(a). *See Brown v. Ralston Purina Co.*, 557 F.2d 570 (6th Cir. 1977); *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Blizard v. Fielding*, 454 F.Supp. 318 (D.Mass.1978), *affirmed sub nom. Blizard v. Frechette*, 601 F.2d 1217 (1st Cir. 1979).

■ Plaintiff has failed to establish that defendant's justification was in fact a pretext for retaliatory animus towards him. The termination followed several suspensions and informal warnings; it was the final step in a measured series of disciplinary responses that began prior to plaintiff's accelerated EEO activity. There was no showing of uniquely oppressive supervision stemming from EEO activism. *Cf. Mead v. United States Fidelity & Guaranty Co.*, 442 F.Supp. 114 (D.Minn.1977); *Francis v. American Telephone and Telegraph Co.*, 55 F.R.D. 202 (D.D.C.1972). Nor is there evidence that the reasons asserted were not valid or sufficient to justify termination if true. It was not shown that other employees found to be similarly disruptive were excused or subject to lesser punitive measures. Moreover, Alfred Davis, a CHPS

member who was as active as plaintiff in filing EEO charges, remains on the job. The distinction urged between sanctioning opposition to arguably discriminatory practices and condemning instances of that opposition when expressed in an unreasonable manner is sustained on the evidence as nonpretextual. Plaintiff's deportment, too often intemperate and belligerently uncooperative, was not integral to the dissemination of his protests under the Act.

■ Plaintiff's additional claim that the means chosen to oppose a clear statutory violation can never be excessive is incorrect as a matter of law. Even if defendant's release-time policy was discriminatory, it is settled that an employer need not refrain from disciplining an employee whose opposition is itself deliberately unlawful. *See McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 803, 93 S.Ct. at 1824–1825. Nothing in Title VII or its legislative history suggests that an employer need similarly refrain when an employee expresses opposition in an openly disloyal, disruptive or otherwise uncooperative fashion. *See Hochstadt v. Worcester Foundation for Experimental Biology, supra*, 545 F.2d at 230. Finally, the conclusion that mere invocation of Title VII does not confer talismanic immunity on all forms of criticism is supported by the limitations imposed on analogous forms of expression presumptively protected under the National Labor Relations Act, *e. g., NLRB v. Local Union No. 1229, IBEW*, 346 U.S. 464, 477–78, 74 S.Ct. 172, 179, 98 L.Ed. 185 (1953); *Boaz Spinning Co. v. NLRB*, 395 F.2d 512 (5th Cir. 1968), or the First Amendment to the Constitution, *e. g., Mount Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 284–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1976); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In both areas, courts have eschewed assertions of absolute employee rights in favor of a balancing test, weighing the substantive rights of the protected employee against an employer's interest in efficiency and harmony in the workplace. *See generally Hanson v. Hoffman*, —— U.S.App.D.C. —— at ——

No. 78–1436 (D.C. Cir. Feb. 7, 1980) (slip op. at 15–19).

Having found that plaintiff's excessive conduct was the cause for his termination, and that this conduct constitutes a legitimate nondiscriminatory reason for defendant's action, the Court concludes that plaintiff is not entitled to relief.[4] In holding against plaintiff, the Court recognizes that his actions, albeit excessive, were bottomed on a commitment to opposing discriminatory practices and defending the statutory rights of his fellow employees. The fact that plaintiff and others have had to carry on a protracted, often bitter struggle to reform personnel practices at the Main Post Office speaks for itself. Although the law affords no remedy in this instance, this should hardly serve to console defendant, whose rigid, at times obstinately bureaucratic supervisory practices and overall style of personnel management were on display during this trial. Defendant will continue to have serious personnel problems unless it alters existing practices. The Court is not unappreciative of the difficulties involved in assuring efficient mail delivery to citizens of this city. It is, however, the Court's earnest hope that in the course of fulfilling its mission the Post Office will take steps to promote a more humane work environment, and thereby lessen the costly and painful burden of litigating endless personnel problems.

Plaintiff has failed to establish his claim to injunctive or monetary relief. The case is dismissed. The Clerk of Court is to enter judgment accordingly.

The Court expresses its special appreciation to Gary H. Simpson, Esquire, counsel for plaintiff, who served at the Court's request in this difficult case. His work was highly professional and of superior quality.

So ordered.

4. Plaintiff's alternative cause of action under the Administrative Procedure Act also fails. The agency decision upholding his termination was neither arbitrary nor an abuse of discretion. The requisite procedures were followed, and a rational connection exists between plaintiff's documented transgressions in work performance and the formally articulated grounds for his dismissal. *See Doe v. Hampton*, 184 U.S.App.D.C. 373, 379–80, 566 F.2d 265, 271–72 (D.C. Cir. 1977); *Gueory v. Hampton*, 167 U.S.App.D.C. 1, 510 F.2d 1222 (D.C. Cir. 1974).