MEMORANDUM AND ORDER
 

 ROGERS, District Judge.
 

 Plaintiff, a former tenured professor at Emporia State University, brought this action alleging that the defendants retaliated against him and constructively discharged him for the exercise of his statutory and
 
 *1030
 
 constitutional rights in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 2000e
 
 et seq.
 
 (Title VII). Named as defendants were Emporia State University; John E. Visser, President of ESU; John E. Peterson, Dean of the School of Liberal Arts and Sciences at ESU; William H. Seiler, Sr., chairperson of the Division of Social Sciences at ESU; and Randall C. Anderson, faculty member and chairperson of the department of economics at ESU.
 

 On August 10,1981, a jury was impaneled and trial was begun in this matter. Evidence was presented over a three and one-half week period. Following the completion of the case, the court submitted plaintiff’s § 1983 claims to the jury for decision and submitted plaintiff’s Title VII claims to the jury for an advisory opinion. On September 10, 1981, the jury returned a verdict in favor of the plaintiff and against all the individual defendants on plaintiff’s § 1983 claims. The jury awarded plaintiff $375,-000 in Compensatory damages and assessed punitive damages of $10,000 against each individual defendant. The jury also advised the court, through the use of special interrogatories, that it found in favor of the plaintiff on his Title VII claims. Thereafter, on September 14, 1981, this court directed the clerk of the court to enter judgment in this case based on the jury verdict in favor of plaintiff on his claims brought pursuant to 42 U.S.C. § 1983. At that time, the court reserved judgment on plaintiff’s Title VII claims. The parties have since provided the court with proposed findings of fact and conclusions of law and the court is now prepared to rule.
 

 Prior to the trial of this matter, the court advised the parties that it intended to submit plaintiff’s Title VII claims to the jury for an advisory opinion. Under Rule 39(c) of the Federal Rules of Civil Procedure, in all actions not triable as of right by a jury, the court on the motion of a party or of its own initiative, may, in its discretion, use an advisory jury. Of course, it is well-settled that there is no right to a trial by jury in actions brought under Title VII.
 
 Slack v. Havens,
 
 522 F.2d 1091 (9th Cir. 1975);
 
 Equal Employment Opportunity Comm. v. Detroit Edison Co.,
 
 515 F.2d 301 (6th Cir. 1975),
 
 vacated on other grounds,
 
 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977);
 
 Johnson v. Georgia Highway Express,
 
 417 F.2d 1122 (5th Cir. 1969). When an advisory jury is used, the ultimate responsibility for findings of fact and conclusions of law remains with the district court.
 
 See Hyde Properties v. McCoy,
 
 507 F.2d 301 (6th Cir. 1974);
 
 Frostie Co. v. Dr. Pepper Co.,
 
 361 F.2d 124 (5th Cir. 1966);
 
 Mallory
 
 v.
 
 Citizens Utilities Co.,
 
 342 F.2d 796 (2d Cir. 1965). Accordingly, in the instant case, the court declines to adopt the jury’s findings on plaintiff’s Title VII claims and now makes the following findings of fact and conclusions of law.
 

 FINDINGS OF FACT
 

 1. Plaintiff, Rodney M. Mitchell, is a forty-eight year old white male. In 1962, plaintiff was hired by defendant, Emporia State University, as an instructor for its economics department.
 

 2. Defendant Randall C. Anderson, at all times relevant hereto, was a full professor, with tenure, at Emporia State University, on the faculty of the Division of Social Sciences.
 

 3. Defendant William H. Seiler, Sr., at all times relevant hereto, was chairperson of the Division of Social Sciences at Emporia State University.
 

 4. Defendant John E. Peterson, at all times relevant hereto, was the Dean of the School of Liberal Arts and Sciences at Emporia State University.
 

 5. Defendant John E. Visser, at all times relevant hereto, was the President of Emporia State University. Pursuant to K.S.A. 76-714, he exercised the administrative and management responsibility for the operation of the University as its chief executive officer. During the course of his administration, President Visser delegated down through the Vice-President for academic affairs, the Dean of the School of Liberal Arts and Sciences, and the chairperson of the Division of Social Sciences, an
 
 *1031
 
 opportunity for certain of the faculty members to make recommendations to him with respect to certain management duties such as salaries and promotions. However, the faculty’s recommendation was not binding on the administration nor the President nor were all such matters delegated to the faculty for recommendation.
 

 6. Defendant Emporia State University is a state funded educational institution whose operation and management is provided for in K.S.A. 76-711
 
 et seq.
 

 7. The duties of professors at Emporia State University consist primarily of teaching their classes and keeping their office hours in order to consult and advise students.
 

 8. From 1962 to 1970, plaintiff’s teacher evaluations prepared by defendant Seiler showed generally grades of average to above average. During this period, plaintiff received annual salary increases.
 

 9. In 1965, plaintiff was promoted to the rank of assistant instructor. In 1967, plaintiff received a doctorate degree in education from the University of Oklahoma. At that time, upon the recommendation of defendant Seiler, plaintiff was promoted to the rank of associate professor and granted full tenure by defendant Visser.
 

 10. In the early 1970’s, plaintiff’s behavior and conduct at Emporia State University became noticeably disruptive. He acted emotionally and disruptively in meetings, classes, and even in social situations, toward administrators, colleagues and students.
 

 11. On March 1, 1973, Emporia State University formally adopted an affirmative action program. The University’s policy on affirmative action is stated in the Faculty Handbook as follows:
 

 It is the policy of Emporia Kansas State College to assure equal employment opportunity to all qualified persons regardless of race, color, religion, national origin or sex, and to promote equal employment opportunity for minorities and women and the physically handicapped through an affirmative action program.
 

 The affirmative action program covers all aspects of employment, including recruitment, hiring, assignment of duties, promotion, tenure, compensation, selection for training, and termination.
 

 Ruth Schillinger, Dean of Women and the Affirmative Action Officer at Emporia State University, testified about the substantial efforts made by the University to attract women for teaching positions in the 1970’s. The Faculty Handbook contained the following statement of policy on sex discrimination:
 

 It shall be the objective of Emporia Kansas State College to have a single policy for recruitment, hiring, promotion, and tenure for men and women in all positions in the Institution, with open advertising and affirmative recruiting of both men and women for all faculty vacancies. Attention will be given to correcting the imbalance of men and women on the staff, while maintaining standards for appointment on merit.
 

 12. On July 22, 1975, a vacancy was created on the economics faculty at Emporia State University due to the resignation of James Sturgeon. Due to the short length of time before the beginning of classes, the usual procedures followed by the University regarding advertising, screening and interviewing for applicants was disregarded.
 

 13. In considering a replacement for Sturgeon, three economics faculty members, plaintiff, Sturgeon and William Williams, and a student, Jim Kilmer, met on July 30, 1975, to review the vitae of the applicants for the position. This group determined that Kristin Williams, the wife of William Williams, was the best applicant for the position.
 

 14. Plaintiff, James Sturgeon and William Williams generally acted as a unified group in disagreement with the other members of the Division of Social Sciences. When acting together, they presented their views in a hostile and disruptive fashion that at times caused other faculty members to fear for their personal safety.
 

 
 *1032
 
 15. On July 31, 1975, a meeting was called by defendant Seiler to consider the naming of a replacement for the vacancy created by Sturgeon’s resignation. The meeting was attended by plaintiff, defendant Seiler, defendant Anderson, William Williams, Professor Patrick O’Brien, Sturgeon and Kilmer. Sturgeon and Kilmer attended through the encouragement of plaintiff and Williams. The attendance of Kilmer, a student, and Sturgeon, a former faculty member, was contrary to established divisional policies and practices. Consequently, they were asked to leave and they did so.
 

 16. It is somewhat unclear exactly what occurred at the July 31 meeting after Sturgeon and Kilmer left. It is clear that the meeting was chaotic. At some point during the meeting, it does appear that plaintiff supported Kristin Williams for the vacant position. However, both plaintiff and William Williams became quite vocal and argumentative during the meeting and each refused to abide by established divisional and institutional guidelines. Eventually, due to the rather chaotic scene which occurred, the meeting was adjourned without completing business.
 

 17. Subsequently, the vacant position was offered to Steven Buckley. Buckley was better qualified than Kristin Williams for the position because he had prior teaching experience on the university level.
 

 18. Thereafter, Buckley declined the position. Defendant Seiler then attempted to offer the position to another applicant, Doris Files. She did not accept the position because she had previously obtained employment for the 1975-1976 academic year.
 

 19. On August 7, 1975, William O’Con-nor was hired to fill the position. O’Connor had received his Ph.D and had prior teaching experience at a university. His qualifications were far superior to those of Kristin Williams.
 

 20. On August 15, 1975, plaintiff met with defendant Peterson to discuss plaintiff’s behavior at the July 31, 1975, meeting. Defendant Peterson informed plaintiff that he had lost respect for him due to his disruptive behavior. Plaintiff replied that he wished to regain the respect he had lost due to his disruptions. Plaintiff agreed to cooperate for the best interests of the economics department. Plaintiff acknowledged that he wanted the best possible progress for the economics department and he agreed to keep a low profile in future actions.
 

 21. On August 18, 1975, defendant Peterson sent a letter to defendant Anderson which stated in pertinent part:
 

 My concerns regarding the condition of our Economics program have been widely voiced since my arrival here four years ago; I have lacked confidence in the faculty, the curriculum, the performance, and the goals of this discipline. Now in the wake of the events of the past two months — namely those surrounding the resignation of Dr. Sturgeon, those concerned with our replacement of him, and those revolving around an Academic Appeals case — my lack of confidence has bloomed into a conviction that we find ourselves with an untenable situation of such crisis proportion that it must be rectified immediately.
 

 Over a period of some two weeks, I averaged twice-daily conferences and twice daily phone conversations with Dr. Seiler on economics-related questions. The Division of Social Sciences appeared to be concerned with little else. I have been visited by faculty members from the division who feel that the very future and welfare of the division is in serious jeopardy. I have been told — and my own assessment is in agreement — that the regular continuance of the educational process has become impossible in the division as conditions now stand; the problems in Economics have totally immobilized it. The division is unable to function because of what one faculty member termed “a tyranization by the economists”.
 

 Although I have not agreed totally with the “federalist approach to governance” embraced by the Division of Social Sciences, I have conceded that it is a legitimate mode of operation as long as
 
 *1033
 
 the job gets done. Now, however, it is my assessment that this approach has not worked, and is not working, in the case of the discipline of Economics. Consequently, it is my judgment that Economics can no longer be permitted the same degree of management of its own affairs as are the other disciplines in the division; such management must be assumed by some other quarter.
 

 22. On August 19, 1975, defendant Peterson sent plaintiff a letter which acknowledged the earlier agreement they had reached. It read as follows:
 

 As I told you I would do at the conclusion of our discussion of last Friday, August 15, 1975, I have removed the paragraph concerning you from the letter which I have sent to Dr. Anderson and substituted a shorter, less harsh paragraph which says:
 

 Dr. Rodney Mitchell holds tenure with us. As far as I am personally concerned, that tenure will be honored as long as he fulfills his assignments competently and performs in a professional manner. My own expectation, however, is that Dr. Mitchell will play no further role. in such educational matters as faculty appointment and recognition, curriculum, and educational policy until such time in the future as he may have earned my confidence and respect, and that of his colleagues in the Division of Social Sciences. Both President Visser and I have discussed this matter with Dr. Mitchell in some depth and Dr. Mitchell is in receipt of a letter from me which makes my expectations quite explicit; he is in agreement and has assured me that he will perform, and otherwise act, accordingly.
 

 Further, as I also told you I would do, I am stating my position regarding what I think your role must be in our Economics program and in the Division of Social Sciences in this letter to you so that I am on record in the matter. This original goes to you, of course, but only President Visser and I will have copies of it.
 

 As far as I am concerned, your tenure with us will be honored as long as you fulfill your assignments competently and perform in a professional manner. As I told you when we talked, however, I have no confidence in your judgment on matters of personnel, curriculum, and educational policy at this time and it is my expectation that you will play no role in such matters in the immediate future. I shall no longer be influenced by your advice and opinions and I shall no longer accept input from you on matters that have to do with the Economics program, the Division of Social Sciences, or EKSC in general. I shall expect you to teach the classes assigned to you competently, but to play no role in matters of policy and decision concerning the Economics program and the affairs of the Division of Social Sciences until such time in the future as you may have earned my respect and confidence.
 

 Finally, if you do not immediately cease what, in my opinion, are disruptive, unprofessional, and improper actions, and if you do not continue to desist from such actions, I shall consider it the obligation of my office to do all in my power to remove you from the EKSC faculty. Again, you and I have discussed this and you have agreed that such actions will cease. If such is the case, I will not have to assume that obligation. Indeed, it is my wish that I do not have to do so.
 

 I trust that this makes my position regarding your present and future role as a member of this faculty quite clear. If it does not, please feel free to discuss the matter further with me.
 

 23. Also on August 19, 1975, defendant Anderson notified the economics faculty that he was assuming the position of program chairperson of the department of economics.
 

 24. During the 1975-1976 academic year, plaintiff performed his teaching responsibilities and held his office hours in accordance with his agreement with defendant Peterson.
 

 
 *1034
 
 25. In December, 1975, Kristin Williams filed charges of sex discrimination against Emporia State University with the Kansas Commission on Civil Rights.
 

 26. In the early part of 1976, the administration of the University attempted to add a senior economist to the economics department. One of the candidates interviewed, Ellis Lamborn, an economics professor from Boise State University, ultimately declined the position saying that the presence of plaintiff on the economics faculty was the most important reason.
 

 27. In July, 1976, plaintiff requested a one-year leave of absence due to his father’s health. Defendant Visser granted plaintiff’s request. Thus, plaintiff was absent from the campus during the 1976 — 1977 academic year.
 

 28. It was generally felt by the entire administration that during the 1976-1977 academic year, while plaintiff was on a leave of absence, the department of economics improved and developed. At the end of the year, Rob Catlett, a member of the economics faculty hired in 1976, told defendant Anderson that he did not want to return to the University if plaintiff was going to return. Also during this year, Rob Catlett and Arthur Jansen, another member of the economics faculty, complained that plaintiff’s economics students were inadequately prepared for additional economics courses.
 

 29. On March 21, 1977, the Kansas Commission on Civil Rights notified defendant Seiler that it would soon begin its investigation of Kristin Williams’ complaint against the University.
 

 30. During the spring of 1977, while on his leave of absence, plaintiff traveled to Emporia and informed defendants Visser, Peterson and Seiler of the KCCR’s efforts to interview him regarding Kristin Williams’ charge. Plaintiff expressed his reluctance to them to give an interview. He was told by them that he should tell the truth.
 

 31. On June 2, 1977, plaintiff was interviewed by Victor Lapauquette, an investigator for the KCCR, regarding Kristin Williams’ complaint. Defendants never learned what was said during that interview. Additionally, during the investigation of Kristin Williams’ charge, defendants were aware that several other professors would be interviewed with respect to the charge. Defendants were not informed who was interviewed or what was said. No other professor has accused the defendants of retaliation against them for participating in the KCCR investigation.
 

 32. Upon plaintiff’s return to Emporia State University in August, 1977, defendant Seiler sent him a “letter of expectation” which stated:
 

 The Dean of the School of Liberal Arts and Sciences considers letters of evaluation and expectation to divisional faculty members from chairpersons are “now established practice.” They should “be done before school opens in August and ... As usual, copies of your letters should be sent to my office.”
 

 I am enclosing for your information and compliance the “General Expectations of Faculty Performance” prepared by Dean Peterson 7-14-76, as well as “The LA&S Letter,” No. 6, August 26, 1976, carrying further explanatory comments about the “General Expectations.” I especially mention that your informational outlines to students at the beginning of your classes stress and state clearly items 5 and 6 in the “General Expectations.” Further, it is your responsibility to refer to the
 
 Faculty Handbook
 
 for explanation of items that may confront you as the year proceeds.
 

 Let me specifically mention several items. Two major requirements are to meet your classes as scheduled and maintain your office hours. In reference to your classes, you should prepare your students in Principles I for Principles II and upper division classes taught by other members of the economics faculty. The burden of satisfactorily preparing students to meet later requirements in economics is yours. You are expected to keep your office hours — -at your specified times — in your office.
 

 
 *1035
 
 You have not turned in any course evaluations in the past. You are expected to give the evaluations, as outlined by divisional policy, the close of the first semester and have them turned in to me. Also, you are expected to get in grade reports and other requested items on time.
 

 You will want to meet the other members of the faculty in Economics and I hope that you will dó so. After that, I suggest that you leave the initiative for any further exchange of comments between you to come from them. If there are any specific assignments in Economics, they will come to you from Dr. Anderson. If you have any questions, you should see him about them. He will check with you about your second semester schedule of courses.
 

 Please re-read your previous letter from Dean Peterson as a continuing guide to you as a faculty member, and if you have any questions concerning items in it, you can discuss them with him.
 

 If you have any questions, please see me about them.
 

 All chairpersons within the School of Liberal Arts and Sciences annually sent a “letter of expectation” to each faculty member under their supervision.
 

 33. On August 24, 1977, defendant Anderson informed the plaintiff that plaintiff would have no responsibility for course scheduling in the future. Anderson informed Seiler of this along with the other members of the economics faculty.
 

 34. Upon the start of the 1977-1978 academic year, defendants began to receive student complaints about plaintiff’s lack of professionalism in his classes. These complaints continued throughout the fall of 1977. In addition, defendants received complaints from other faculty members that plaintiff was interrupting them and interfering with their job performance.
 

 35. On August 29, 1977, defendant Seiler and defendant Anderson met with plaintiff and instructed plaintiff to leave the other economists alone and let them get their work completed.
 

 36. Thereafter, on September 19, 1977, defendant Anderson recommended to defendant Seiler that plaintiff be further limited in the areas of employment, independent studies, salary, academic input and course scheduling. On September 29, 1977, defendant Seiler informed plaintiff that plaintiff would no longer have any choice in the selection of courses he was to teach.
 

 37. On October 3, 1977, defendant Anderson sent defendants Peterson and Seiler a record of plaintiff’s activities for the period from August 29, 1977 to October 3, 1977 and suggested that further limitations be placed on the plaintiff. Thereafter, on October 19, 1977, defendant Anderson sent another report of plaintiff’s activities for the period July 31,1975 to October 18, 1977. These reports generally showed that plaintiff was failing to post and keep office hours, contrary to the general expectations of all faculty members in the School of Liberal Arts and Sciences.
 

 38. During the fall of 1977, defendant Seiler resigned his position as chairperson of the Division of Social Sciences. On November 2, 1977, defendant Seiler asked plaintiff not to participate in the administrative process of selecting a new chairperson because he believed that plaintiff should focus his attention on improving his job performance. Plaintiff ignored this request and attempted to participate at the chairperson selection meeting. At that meeting, defendant Seiler denied plaintiff a ballot. All other faculty members were allowed to vote at that meeting.
 

 39. On November 4, 1977, plaintiff complained to defendants Visser, Seiler and Peterson about the restrictions that had been placed on him. Thereafter, on November 15, 1977, following plaintiff’s complaint to the defendants, defendant Anderson notified William Phillips, a faculty member, and defendant Seiler that plaintiff would not be eligible for consideration as a candidate for division chairperson.
 

 40. On November 18, 1977, defendant Anderson informed John Webb, Dean of Student Affairs, defendant Seiler, and defendant Peterson that plaintiff should have
 
 *1036
 
 no role with any student groups at the University. Plaintiff, in the past, had sponsored several student organizations, including the Susan B. Anthony club, which was a women’s rights advocacy group.
 

 41. On November 29, 1977, plaintiff notified defendant Seiler that he believed that his rights were being violated and that he objected to the restrictions that had been placed on him.
 

 42. Defendant Anderson notified plaintiff on December 14, 1977, that plaintiff would not be allowed to teach summer school for additional compensation in the summer of 1978. In the past, plaintiff had always been given the option of deciding whether he wished to teach summer school. Plaintiff registered a complaint with defendants Seiler and Anderson regarding this decision.
 

 43. On December 22,1977, plaintiff filed a charge of sex-based retaliatory discrimination with the Equal Employment Opportunity Commission.
 

 44. On January 12, 1978, defendants Seiler and Anderson refused to allow plaintiff to participate in a selection committee meeting for the same reasons that they had informed plaintiff of in the past.
 

 45. Plaintiff filed a charge on January 23, 1977, with the Kansas Commission on Civil Rights alleging retaliation for his participation in the investigation conducted by the KCCR regarding Kristin Williams’ charge.
 

 46. The University was notified on January 24, 1978, by the KCCR, that the plaintiff had filed a charge against it and its representatives.
 

 47. On January 26, 1978, defendants Seiler and Anderson refused to allow plaintiff to teach independent studies.
 

 48. On February 24, 1978, defendant Visser instructed plaintiff to adhere to the limitations that had been placed on him.
 

 49. During the months of February and March, defendants Peterson, Seiler and Anderson urged termination of plaintiff to defendant Visser. Termination was urged because of the disruption and disharmony plaintiff had caused and because of his pattern of ignoring administrative policies and procedures.
 

 50. On May 5, 1978, defendant Visser sent the following letter to plaintiff:
 

 This is to respond to your request for my assistance in resolving a problem which you are encountering in the Division of Social Sciences. I have consulted with a number of individuals, and with yourself, in an effort to clarify the matter.
 

 You have complained that restrictions to which you have not agreed have been imposed upon you in derogation of certain fundamental rights. Without commenting upon your perception, please be informed that I have advised your Dean and Division Chairperson that you are no longer subject to any limitations in the performance of your responsibilities except for those limitations which are imposed upon any faculty member by the responsibilities associated with holding a faculty position.
 

 You are aware from our discussions that the restrictions which served as the basis for your request for my assistance were imposed upon you as a result of concerns over your failure to perform your faculty duties in a responsible manner. While I am by this letter lifting such restrictions, I am also advising you that there is substantial concern about your ability to continue to serve this University.
 

 I want to remind you that when you returned from your leave of absence this past year you expressed your gratitude for having been extended the leave and you assured me with some emotion that you had reassessed your effectiveness as a faculty member (as I had requested that you do in my letter of July 14, 1976 in which I granted the leave) and that you were prepared to make a responsible contribution to the University. I have seen no evidence of this commitment on your part.
 

 During the coming year, your performance as a faculty member and your ability to meet all the responsibilities of your position shall be carefully examined. The
 
 *1037
 
 manner in which you conduct yourself and carry out your responsibilities shall determine your future with this University.
 

 If you have any questions regarding this matter you are welcome to discuss them with me in my office.
 

 51. On May 15, 1978, plaintiff submitted his letter of resignation to defendant Visser. It read as follows:
 

 In considering your offer of a contract for the academic year 1978-1979, I have found it necessary to review the status of my position at Emporia State University. After seriously considering all of the facts in the situation, I have reached the conclusion that it is not possible for me to continue operating in such an unprofessional atmosphere in which the representatives of the University show little or no respect for civil liberties and academic freedom. My sincere efforts to bring about a positive change in this atmosphere have been thwarted.
 

 Because I feel dedicated to the ideals of the academic community, I have striven to fulfill my obligations to my students despite the extreme pressures imposed upon me by the administrative restrictions of my personal and academic behavior. However, the notification that there is to be no increase in salary for the coming year convinces me that it would be futile to continue making such extraordinary efforts in the future. Medical consultations have confirmed my opinion that continuing to do so would be harmful to my health.
 

 Please consider this to be my letter of resignation.
 

 At trial, plaintiff testified that he resigned because he “had no more cheeks to turn.”
 

 52. On June 27, 1978, plaintiff filed the instant action.
 

 CONCLUSIONS OF LAW
 

 1. This is a proper Title VII action and jurisdiction and venue properly lie in this court.
 

 2. Plaintiff has properly exhausted all procedural prerequisites to a Title VII action.
 

 3. Defendant Emporia State University is an “employer” within the meaning of the statutory definition contained in Title VII, 42 U.S.C. § 2000e(b). The individual defendants are agents of defendant Emporia State University. Plaintiff is an “employee”, protected by Title VII, as defined in 42 U.S.C. § 2000e(f).
 

 4. Title VII of the Civil Rights Act of 1964 bans employment discrimination by employers, labor organizations and employment agencies affecting commerce, on the basis of race, color, religion, sex, or national origin in hiring, compensation, conditions of employment and dismissals. 42 U.S.C. § 2000e
 
 et seq.
 

 5. Title VII makes it an unlawful employment practice for employers subject to its provisions to discriminate against an employee “because he has opposed any practice made an unlawful employment practice” by Title VII. 42 U.S.C. § 2000e-3(a). This section is to be liberally construed.
 
 Rutherford v. American Bank of Commerce,
 
 565 F.2d 1162 (10th Cir. 1977). It is sufficient that the opposition is a good faith belief that the practice violates Title VII, even though it is later found not to be in violation of Title VII.
 
 Berg v. LaCrosse Cooler Co.,
 
 612 F.2d 1041 (7th Cir. 1980);
 
 Sias v. City Demonstration Agency,
 
 588 F.2d 692 (9th Cir. 1978). However, not all “opposition” activity is protected under 42 U.S.C. § 2000e-3(a). A court must balance Title VII’s goal of encouraging reasonably expressed opposition to employer discrimination against management’s recognized prerogative to maintain internal discipline and a stable working environment.
 
 Hochstadt v. Worcester Foundation for Experimental Biology,
 
 425 F.Supp. 318 (D.Mass. 1976),
 
 aff’d,
 
 545 F.2d 222 (1st Cir. 1976);
 
 Garrett v. Mobil Oil Corp.,
 
 531 F.2d 892 (8th Cir. 1976),
 
 cert. denied,
 
 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); Gonzalez v.
 
 Bolger,
 
 486 F.Supp. 595 (D.D.C.1980). The employee’s conduct must be reasonable under the circumstances,
 
 see Jeffries v.
 
 
 *1038
 

 Harris Community Action Ass’n,
 
 615 F.2d 1025 (5th Cir. 1980), and must not so impede the performance of his job that it renders him ineffective,
 
 see Rosser v. Laborers’ International Union,
 
 616 F.2d 221 (5th Cir. 1980),
 
 cert. denied,
 
 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980).
 

 6. Title VII also makes it an unlawful employment practice for an employer subject to its provisions to discriminate against an employee “because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing” under Title VII. 42 U.S.C. § 2000e-3(a).
 

 7. To establish a claim of retaliation, a plaintiff must show: (1) protected participation or opposition under Title VII known by the alleged retaliator; (2) an employment action or actions disadvantaging persons engaged in protected activities; and (3) a causal connection between the first and second elements, that is, a retaliatory motive playing a part in the adverse employment actions.
 
 Whatley v. Metropolitan Atlanta Rapid Transit Auth.,
 
 632 F.2d 1325 (5th Cir. 1980);
 
 Grant v. Bethlehem Steel Corp.,
 
 622 F.2d 43 (2d Cir. 1980);
 
 Womack v. Munson,
 
 619 F.2d 1292 (8th Cir. 1980),
 
 cert. denied,
 
 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1980);
 
 Hochstadt v. Worcester Foundation for Experimental Biology, supra.
 
 The order of proof for a retaliation action follows the rule established in
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and recently refined in
 
 Texas Dept. of Community Affairs v. Burdine,
 
 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
 
 See Whatley v. Metropolitan Atlanta Rapid Transit Auth., supra; Grant v. Bethlehem Steel Corp., supra; Hochstadt v. Worcester Foundation for Experimental Biology, supra; Garrett v. Mobil Oil Corp., supra; Gonzalez v. Bolger, supra; Brown v. Biglin,
 
 454 F.Supp. 394 (E.D.Pa.1978). First, the plaintiff must prove a prima facie case of retaliatory treatment by a preponderance of the evidence. A plaintiff demonstrates a prima facie case by showing: (1) that he engaged in protected activity,
 
 i.e.,
 
 he opposed or participated in Title VII proceedings; (2) that his employer was aware of the protected activities; (3) that he was subjected to adverse employment actions; and (4) that the adverse employment actions followed his protected activities within such period of time that the court can infer retaliatory motivation.
 
 Hochstadt v. Worcester Foundation for Experimental Biology, supra; Sutton v. National Distillers Products Co.,
 
 445 F.Supp. 1319 (S.D.Ohio 1978);
 
 Bradington v. International Business Machines Corp.,
 
 360 F.Supp. 845 (D.Md. 1973),
 
 aff'd,
 
 492 F.2d 1240 (4th Cir. 1974). If this burden is met, a mandatory presumption arises, which requires the court to enter judgment for the plaintiff if the defendant does not rebut the presumption.
 
 Texas Dept. of Community Affairs, supra.
 
 The burden then shifts to the defendant to set forth, through admissible evidence, a valid, nondiscriminatory reason for his treatment of the plaintiff. If the defendant does so, then plaintiff must show that the reason advanced by defendant is a mere pretext for the kind of discrimination forbidden by Title VII. It must be emphasized that the defendant bears only a burden of production and that the burden of persuasion remains always with the plaintiff.
 
 Id.
 

 8. The primary issue in a retaliation case under the aforementioned legal test is the nature, intent and motive of the employer’s conduct as demonstrated by both direct and circumstantial evidence.
 
 McDonnell Douglas Corp. v. Green, supra. Also see Romero v. Union Pacific Railroad,
 
 615 F.2d 1303 (10th Cir. 1980). As the court stated in
 
 Jeffries v. Harris Co. Community Action Ass’n,
 
 425 F.Supp. 1208, 1216 (S.D. Tex.1977),
 
 aff’d in part and rev’d in part,
 
 615 F.2d 1025 (5th Cir. 1980):
 

 [A]s in most cases where the court is called upon to review the motive and intent behind an employment decision, the boundaries of the protection afforded to [Title VII] plaintiffs and the equivalent duty imposed upon a Title VII employer cannot be measured precisely. Rather, the Court, in applying the statute to these facts, must utilize a common
 
 *1039
 
 sense approach which takes into account the realities and complexities of the employer-employee relationship and determine whether [Title VII] has been violated based on “reasonable inferences drawn from the totality of facts, the conglomerate of activities, and the entire web of circumstances presented by the evidence on the record as a whole.”
 
 Aeronca Mfg. Co. v. N.L.B.B.,
 
 385 F.2d 724, 727-28 (9th Cir. 1967).
 

 Factors to be considered in determining whether the employer has retaliated discriminatorily and whether the employer’s stated reason for discharging an employee is merely a pretext for a retaliatory decision include: the employer’s conduct against other persons who have committed acts of comparable seriousness; the employer’s pri- or treatment of the employee and its reaction to the employee’s legitimate civil rights activities; and the employer’s “general policy and practice with respect to [those that oppose or participate in Title VII proceedings].”
 
 McDonnell Douglas Corp. v. Green, supra
 
 411 U.S. at 804-05, 93 S.Ct. at 1825.
 

 9. An employee is constructively discharged when the employer deliberately renders the employee’s working conditions intolerable so as to force him to resign from his position.
 
 Coe v. Yellow Freight System, Inc.,
 
 646 F.2d 444 (10th Cir. 1981);
 
 Muller v. United States Steel Corp.,
 
 509 F.2d 923 (10th Cir. 1975),
 
 cert. denied,
 
 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975)..
 

 10. The first issue for determination is whether the defendants retaliated against the plaintiff for his promotion of Kristin Williams at the meeting of July 31, 1975, for the vacancy created by James Sturgeon’s resignation. The court has some difficulty in finding that the plaintiff has made out a prima facie case on this claim. The facts do reveal that plaintiff did propose Kristin Williams as the best qualified candidate for the vacancy at the meeting of July 31. Furthermore, certain employment actions were taken against the plaintiff by defendants after that meeting. However, the manner in which plaintiff proposed Mrs. Williams’ candidacy and the reasons for his proposal of Mrs. Williams were in marked dispute during the trial. As shown by the findings of facts, plaintiff was extremely vocal and argumentative during the short meeting. While these actions alone might not prevent the plaintiff from proving a prima facie case, we do find that his reasons for proposing Mrs. Williams do cause certain problems. It was not clearly established during the course of the trial, at least in the court’s mind, why he desired Mrs. Williams as the new faculty member. He obviously did believe that she was the best qualified for the position. However, it does not appear that he was opposing a practice made unlawful by Title VII. The testimony during the trial did not indicate any comments that were made by the plaintiff that would demonstrate such an intent. Although plaintiff had sponsored student women’s rights groups in the past, no evidence was presented that he had ever previously complained to anyone about the lack of females in the Division of Social Sciences or the department of economics.
 

 However, as previously stated, 42 U.S.C. § 2000e-3(a) is to be liberally construed. Assuming that plaintiff was in fact opposing a practice made unlawful by Title VII and that he did establish a prima facie case of retaliation regarding the July 31, 1975 meeting, we find that the defendants have clearly articulated a legitimate, nondiscriminatory reason for their subsequent treatment of plaintiff. Furthermore, we do not find that the plaintiff has demonstrated that the reason advanced by the defendants are a mere pretext.
 

 It was clear to the court that the defendants placed certain limitations on the plaintiff because of his history of disruptive and unprofessional conduct. Plaintiff’s actions and conduct at the July 31 meeting triggered the future employment decisions of the defendants, not plaintiff’s support of a female for the vacant economics position. This finding is supported by each defendant’s considerable testimony regarding their dedication to the principles of sexual equality.
 

 
 *1040
 
 11. The court moves on to a determination of whether the defendants retaliated against the plaintiff for his participation in the investigation of Kristin Williams’ KCCR complaint and his subsequent filings of charges with the E.E.O.C. and the K.C.C.R. alleging retaliatory conduct by the defendants. Here the court finds that plaintiff has made out a prima facie case with respect to each incident. However, as we found above, the defendant articulated a legitimate nondiscriminatory reason for their treatment of plaintiff. Furthermore, the court fails to find that plaintiff demonstrated that the reason advanced by the defendants was a mere pretext.
 

 The actions taken by the defendants were efforts by them to improve the economics department at Emporia State University. The court is unable to find that the actions were taken because of an unlawful retaliatory intent. The court concludes that the defendants did not violate Title VII in any of their actions toward plaintiff.
 

 12. Finally, the court finds that the plaintiff has not shown by a preponderance of the evidence that he was constructively discharged by the defendants. The plaintiff has not persuaded the court that the defendants deliberately made his working conditions so intolerable so as to force him to resign. All of the actions taken by the defendants were in response to the disruptive conduct exhibited by the plaintiff. In an organization the size of a state university, it is necessary that administrators be clothed with the necessary authority to insure the efficient and orderly operation of the institution. Our constitution and statutes mandate that freedom of expression shall not be restricted or limited but freedom of expression should not be used as a disguise to embark upon a campaign to disrupt the educational processes of a state institution. The need for discipline is not limited to the army, the navy, the air force, or the marines. University presidents, deans, and faculty heads are charged with serious responsibilities and their hands must not be tied as long as they are carrying out their assigned tasks in a manner not violative of constitutional or statutory protections. In summary, the court finds that the discipline imposed on the plaintiff was not imposed by reason of the plaintiff’s exercise of his statutorily protected rights but rather was imposed for completely legitimate reasons and the same discipline would have been imposed upon any other professor acting with the same disregard of the objectives of the institution and the rights of his fellow faculty members. Title VII provides a shield against discrimination or sanctions arising by opposition to or participation in Title VII proceedings, but this court will not permit the shield to be turned into a sword to enable the plaintiff to act in a manner and fashion that totally defeats the employer-employee relationship. Furthermore, any limitations that had been placed on the plaintiff by the defendants were removed by defendant Visser on May 5, 1978. Plaintiff then voluntarily resigned on May 15, 1978. Thus, the court cannot find that the defendants forced him to leave his tenured position at Emporia State University.
 

 13. Plaintiff has not shown by a preponderance of the evidence that defendants retaliated against him because of opposition to alleged unlawful practices or participation in Title VII proceedings, as outlawed in 42 U.S.C. § 2000e-3(a). The court, having carefully observed the demeanor of those who testified and assigning much more credibility to the testimony of the defendants’ witnesses and of the defendants themselves, finds that the reason offered by defendants for the actions taken against plaintiff was in fact the primary force behind these actions and not as a pretext to carry out a surreptitious policy of retaliation. In addition, plaintiff has not shown by a preponderance of the evidence that the defendants constructively discharged him. Accordingly, plaintiff is not entitled to relief.
 

 14. In the event that any of the foregoing Findings of Fact also constitute Conclusions of Law, they are also adopted as Conclusions of Law. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are also adopted as Findings of Fact.
 

 
 *1041
 
 15. Judgment shall be entered for the defendants and against the plaintiff on all of plaintiff’s claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
 
 et seq.
 

 IT IS SO ORDERED.