**Dorothy S. STEINLE, Plaintiff,**

v.

**The BOEING COMPANY and Dudley Morris, Defendants.**

No. 90–1337–SAC.

United States District Court, D. Kansas.

March 30, 1995.

James S. Phillips, Jr., Phillips & Phillips, Chartered, Wichita, KS, for plaintiff Dorothy S. Steinle.

Mary K. Babcock, Gloria G. Flentje, Mikel L. Stout, Wichita, KS, for defendants Boeing Co., Dudley Morris.

## MEMORANDUM AND ORDER

CROW, District Judge.

Dorothy S. Steinle commenced this case seeking damages under the Equal Pay Act (EPA), Title VII, the Kansas Act Against Discrimination (KAAD), as well as supplemental claims for the intentional infliction of emotional distress. On February 4, 1992, the court entered a memorandum and order which, *inter alia*, granted the defendants' motion for summary judgment on the plaintiff's intentional infliction of emotional distress claims. *See Steinle v. Boeing Co.*, No. 90–1377–SAC, 1992 WL 53752, 1992 U.S.Dist. LEXIS 2708 (D.Kan. Feb. 4, 1992); *see also Steinle v. Boeing Co.*, 785 F.Supp. 1434 (D.Kan.1992) (summarizing history of the case). In *Steinle v. Boeing Co.*, 785 F.Supp. at 1444, the court certified its order denying retroactive application of the Civil Rights Act of 1991 as appropriate for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In *Steinle v. Boeing Co.*, 24 F.3d 1250, 1251 (10th Cir.1994), "in view of the Supreme Court's determination [in *Landgraf v. USI Film Prods.*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ] under virtually identical circumstances that the 1991 Act's provisions permitting recovery of compensatory damages and a jury trial are not to be given retroactive application," the Tenth Circuit affirmed this court's interlocutory order. After receipt of the mandate, the case was scheduled for trial.

On March 21, 1995, trial of this case commenced. The plaintiff's EPA claims were the only claims tried to the jury. Over Boeing's objection, the plaintiff's Equal Pay Act claims and her Title VII claims were tried simultaneously. *See Steinle v. Boeing*, No.

90–1337–SAC, 1994 WL 732605, 1994 U.S.Dist. LEXIS 19128 (D.Kan. Nov. 29, 1994). Prior to trial, Boeing filed a motion in limine to exclude from the jury evidence relevant to the plaintiff's Title VII retaliation claims. During trial, Boeing renewed its request to exclude evidence of retaliation. Upon reconsideration of its position, Boeing abandoned its attempts to exclude evidence of retaliation based upon the defendants' assessment that such evidence was also relevant to the plaintiff's EPA claims.[1] Therefore, essentially all of the evidence relevant to all of the plaintiff's claims was considered by the jury in rendering its verdict on the plaintiff's EPA claims.

Trial of this case took ten days. Twenty-six witnesses were called; several hundred pages of exhibits were introduced into evidence.

The jury's verdict found that the plaintiff had not established a prima facie case under the EPA. Specifically, the jury answered the following question in the negative:

1. Did the plaintiff, Dorothy Steinle, prove that she was paid a lower rate of pay than men performing substantially equal work on jobs requiring substantially equal skill, effort, and responsibility which were performed under similar working conditions?

*See* (Dk. 149) (Jury verdict).

This case comes before the court for its decision on the plaintiff's Title VII claims. Having considered the evidence presented, the arguments and briefs of counsel, and the applicable law, the court finds that the plaintiff did not carry her burden of proof on her Title VII claims. This memorandum and order constitutes the court's findings of fact and conclusions of law.

1. Steinle did not seek to impose personal liability against Dudley Morris on her EPA claims.

2. In 1984, however, the plaintiff suffered a $500 decrease in salary. At that time, a secretary's grade was dependant upon the comparative status of their boss. Because a new position was created above her boss at that time, Tom Updegrove, Steinle's pay concomitantly suffered because of the restructuring. Steinle viewed this

## Findings of Fact

1. The plaintiff, Dorothy Steinle, was originally hired by the defendant, the Boeing Company (Boeing), as a Stenographer B in 1961. Steinle has on occasion taken breaks in her employment with Boeing, but her years of service total approximately twenty-five years. Steinle's duties, responsibilities, classifications and pay as a Boeing employee have generally increased across time.[2] The following is a brief summary of Steinle's work history at Boeing:

| | |
|---|---|
| 1961–1967 | Stenographer A or B |
| 1967–1984 | Secretary A, B or C |
| 1985–1986 | Operator 2–Facilities |
| 1987–1988 | Coordinator 2–Facilities |
| 1988–1989 | Analyst 3–Facilities Adm. |
| 1989–1991 | Planner 4–Facilities Layout |
| 1992—> | Coordinator 4–Facilities |

*See* Defendants' Exhibit # 1.

2. Boeing is a manufacturer engaged in the production of large assemblies and components for commercial and military aircraft.

3. Steinle was promoted to a Coordinator 2 position in the summer of 1987. That position was classified as a General Office (nonexempt) position. *See* 29 U.S.C. §§ 201 *et seq.* Steinle performed many of her job related tasks in a prompt and professional manner. Across time, Steinle received several favorable job evaluations. At trial, some of Steinle's former managers praised her job performance while she had been under their supervision.

4. Based upon her interest, knowledge and familiarity with the position, Steinle was offered the position of contract administrator. Steinle believed that accepting this promotion also entitled her to be placed on the Professional & Administrative (exempt) payroll (P & A). In general, this classification was viewed as more prestigious and offered more tangible benefits than a G.O. position, including a higher annual salary.

circumstance as extremely unfair and was unable to come to grips with this event. In part, Steinle blamed Updegrove for the $500 decrease in salary. Based upon Steinle's inability to deal with this event in a reasonable and professional manner, Updegrove ultimately determined that he could no longer work effectively with Steinle.

At trial, Steinle became emotional recalling the loss of the $500 in 1984.

5. In 1988, Steinle's supervisor, Bob McKee prepared a memorandum on Steinle's behalf seeking an exemption to the standards necessary to qualify for P & A status. Based upon Boeing's assessment of Steinle's qualifications, that request was denied.

6. McKee informed Steinle that the request for immediate reclassification to P & A status had been denied. McKee asked Steinle if she nevertheless wanted the job of contract administrator, indicating that it would provide her with the opportunity to work toward achieving P & A status as she progressed through the G.O. grades and demonstrated proficiency at the contract administrator position. Steinle accepted the position of contract administrator. In October 1988, Steinle commenced her duties as contract administrator as a G.O. Analyst 3.

7. Despite taking the position of contract administrator, Steinle took the denial of P & A status extremely poorly. Steinle's bitterness over the denial of P & A status had an adverse impact on Steinle's job performance.

8. Despite Steinle's proficiency at certain jobs or certain tasks required by other positions, Steinle's performance in the position of contract administrator was below an acceptable standard. Steinle's dogged reliance on outdated and inappropriate form contracts and unwillingness to incorporate comments and revisions from Boeing's legal department are but two examples of the problems she had in the position of contract administrator. Steinle did not have any formal legal training in the drafting of construction contracts.

9. Steinle was and apparently remains extremely sensitive to any criticism; Steinle took even constructive criticism personally. Although Boeing attempted to use a model contract in the drafting of all its contracts, no single contract suited each situation. Contract changes deemed necessary by her supervisors or the Boeing legal department were also viewed as personal affronts. Steinle was argumentative with McKee and her attitude made it very difficult to work with her in the revision of contracts she had drafted.

10. On March 2, 1989, Steinle contacted Tom Anderson at Boeing's Employee Relations Office to file a grievance. Steinle complained that she had been promised a promotion to a P & A position but continued to work as a G.O.

11. Based upon the increasing demands for new construction, in March 1989 the construction management organization at Boeing was divided into two groups. One group, Org. 6430, was supervised by McKee. Org. 6430 managed construction contracts of $1,000,000 or less. The other group, Org. 6320, was supervised by Dudley Morris. Org. 6320 was assigned to manage construction contracts valued at more than $1,000,000. Morris was hired by Boeing in August 1988. At the time he was hired by Boeing, Morris had almost thirty years of experience in construction work.

12. In order to resolve Steinle's grievance, a meeting attended by Steinle, Karen Jalali (Steinle's personnel representative), Tom Updegrove (McKee's superior) and Anderson was held. As a consequence of that meeting, Steinle was assigned to Org. 6320 and therefore was under Morris' supervision. After a 60–day review period, and if Morris approved, Steinle would be upgraded to Grade 4. Steinle appeared to be satisfied with that resolution of her grievance.

13. In May 1989, Morris approved an upgrade of Steinle to Analyst 4 pursuant to the plan to resolve her grievance.

14. Based upon his assessment that Steinle's work was substandard, Morris began to monitor her work more closely.

15. In June and July of 1989, Morris took Steinle to task for working unauthorized overtime. Morris was, as were all Boeing managers, limited in the amount of overtime he could dole out to his employees. In determining the appropriate manner to allot overtime among his employees, Morris weighed the relative needs of each employee's request for overtime. Morris did not believe that Steinle's need for overtime was justified. Morris attributed Steinle's need for overtime to the fact that Steinle chose to come to work very early in the morning and leave early in the afternoon. Steinle's job entailed coordinating information or efforts with other employees. Because other employees did not

work Steinle's early morning/early afternoon schedule, Steinle would need overtime to meet with other employees who worked the standard workshift which ended at 5:00 p.m. Morris instructed Steinle to observe regular working hours as Boeing did not have flex time in 1989. Steinle viewed these denials of overtime and the requirement that she observe regular working hours as discriminatory and impermissible deprivations of benefits.

16. The buildings in which Morris' employees worked on the Boeing facility was located far from any eating establishments. Based upon that fact, upon assuming the role of supervisor, Morris did not enforce the forty-minute lunch hour rule that otherwise governed Boeing's employees. However, on one occasion, most of Steinle's coworkers were late returning from a farewell luncheon held for an employee who was leaving Boeing. The delay in their return was caused by train traffic. Although Morris would have simply overlooked the employees' tardiness under those circumstances, because of Steinle's complaints to upper management, Morris was thereafter compelled to rigidly enforce the lunch hour time limitations.

17. Morris believed that the form construction contracts used by Boeing prior to his arrival were unnecessarily convoluted and difficult to understand. Morris set out to simplify and streamline the model contracts used by Boeing. Consequently, the contracts which Steinle had grown comfortable using were no longer considered adequate. Despite the fact that Morris had the authority to draft the contracts in any manner he deemed appropriate (subject to review by the legal department), Steinle resisted change. Even at trial, Steinle defended the language of the contracts which she had drafted which Morris had deemed appropriate to modify or correct. Because she viewed Morris' revisions as unnecessary, Steinle took Morris' actions as a personal attack and as an attempt to take her job away. Steinle resisted Morris' corrections and redraft suggestions.

18. On July 26, 1989, Steinle filed a complaint with Boeing's internal Office of Equal Employment Opportunity (EEO). Steinle claimed that she had been unlawfully discriminated against by Boeing. Specifically, Steinle claimed that she was denied P & A status while male employees doing the same contract administration work were classified as P & A. An investigation by the EEO office ensued.[3]

19. After filing her EEO complaint, Steinle called the EEO office on an almost daily basis. In short, Steinle believed that Morris had it in for her and that each and every action taken by Morris was motivated by his desire to retaliate against her for filing a discrimination claim. The following comprises a list of the significant acts of retaliation by Morris or other Boeing employees claimed by Steinle: [4]

(a) Morris was systematically taking away her job duties;

(b) Morris increased his monitoring and scrutiny of Steinle's work;

(c) Morris was super-critical of all of Steinle's work;

(d) Morris denied all of Steinle's requests for overtime;

(e) Morris and certain coworkers personally ridiculed and made fun of Steinle and/or her work;

(f) In comparison to the manner in which he treated other employees under his supervision, Morris was not pleasant to Steinle; Morris was rude and surly to Steinle;

(g) Morris reprimanded Steinle for excessive telephone calls;

(h) Unlike her coworkers, Morris required Steinle to rigidly adhere to the daily work schedule.

---

**3.** That investigation ultimately concluded that there was no evidence that Steinle was the victim of discrimination and that there was no evidence of retaliation by Morris. *See* Find of Fact # 21.

**4.** The court has considered all of the evidence and all of the claims advanced by the plaintiff. The court will not attempt to systematically address each and every instance of "retaliation" identified by the plaintiff at trial. The court has simply reduced the plaintiff's claims to general categories for purposes of discussion in this memorandum and order.

(i) Rather than punish Morris for retaliating against Steinle, Steinle was transferred out of Org. 6320 to an opening in the Planning organization.

20. Morris denied that he ever retaliated against Steinle after learning that she had filed an EEO complaint. Morris basically conceded that he eventually became frustrated with dealing with Steinle as she viewed every comment, remark or act he made, no matter how innocuous, as evidence of retaliation.

21. Boeing's internal investigations of Steinle's complaints ultimately concluded that her claims of unequal pay for substantially equal work were without merit. However, the EEO office did recommend that Morris receive further management training. In accordance with this recommendation, Morris took a course called "Coping with Difficult People."

22. In order to resolve the tension between Steinle and Morris, Steinle was transferred to an opening in a Planning organization. Initially, Steinle was not receptive to the idea of a transfer. Ultimately, Steinle agreed that a new position might be a good move for her. Steinle began working in Planning on November 2, 1989.

23. On November 20, 1989, Steinle filed a charge of sex discrimination and retaliation with the Kansas Commission on Civil Rights. Steinle did not file an amended charge, nor did she file a motion for reconsideration after the KCCR closed its file because Steinle filed suit in July 1990.

### Conclusions of Law

1. This court has jurisdiction over the parties and subject matter in this case pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1343. The plaintiff has met the jurisdictional requirements for filing this suit.

2. Boeing is an "employer" within the meaning of 42 U.S.C. § 2000e(b) and is subject to Title VII. Morris concedes that he is subject to Title VII as an agent of an "employer." [5]

3. Boeing is also subject to the provisions of the EPA.

4. The jury's finding that the plaintiff failed to establish a prima facie case under the EPA is binding on the court's disposition of the plaintiff's Title VII wage disparity claims. *See Tidwell v. Fort Howard Corp.*, 989 F.2d 406 (10th Cir.1993). Even if it were not bound by the jury's verdict, the court would conclude that the plaintiff failed to demonstrate that she was paid a lower rate of pay than men performing substantially equal work on jobs requiring substantially equal skill, effort and responsibility which were performed under similar working conditions. Moreover, the plaintiff did not prove intentional discrimination. *See id.*

5. Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, the plaintiff must prove: "(1) [he] engaged in a protected opposition to discrimination or participation in a proceeding arising out of the discrimination, (2) adverse action by the employer subsequent to the protected activity, and (3) a causal connection between the employee's activity and the adverse action." *Griffith v. State of Colo., Div. of Youth Services*, 17 F.3d 1323, 1331 (10th Cir.1994) (citation omitted); *see Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir.1994). "The plaintiff need prove only a reasonable good faith belief that there was discrimination". *Henry v. Gehl*, 867 F.Supp. 960, 967 (D.Kan.1994) (citing *Mitchell v. Visser*, 529 F.Supp. 1034, 1044 (D.Kan.1981)); *see Dey*, 28 F.3d at 1458 (plaintiff need not succeed on her sexual harassment claim to make out a prima facie case of retaliatory discharge; "Instead, 'it is sufficient if the plaintiff has a reasonable belief that she is

---

5. While not raised by Morris, the court does not believe that he would be personally liable under Title VII. *See, Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) ("'The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the act.'") (*quoting Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991)). In light of the court's ruling on the issue of liability, this point is largely academic.

challenging conduct [that violates] Title VII.'") (*quoting Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989)). An informal complaint to management qualifies as protected activity. *Phelps v. Sears Roebuck and Co.*, No. 90–4133, 1993 WL 523202, 1993 U.S.App. LEXIS 33587 at *14 (10th Cir. Dec. 15, 1993); *see Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2nd Cir.1990).

> If a prima facie case is established, the burden of production shifts, and the defendant must articular a legitimate, nondiscriminatory reason for the adverse action. "Once the defendant has dispelled the inference of retaliation by establishing a legitimate reason, 'the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination.'"

*Purrington v. University of Utah,* 996 F.2d 1025, 1033 (10th Cir.1993) (*quoting Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988) (*citing Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)). "Proof of retaliatory motive need not be through direct evidence of retaliatory animus, but may also be established through evidence that other employees in similar circumstances were treated differently." *Phelps,* 1993 WL 523202 at *5, 1993 U.S.App. LEXIS 33587 at 14–15 (citation omitted).

■ 6. Assuming, *arguendo,* that the plaintiff has exhausted her administrative remedies on her retaliation claims, the plaintiff has failed to demonstrate a causal connection between the protected activity and the defendants' purported retaliatory actions. The plaintiff has failed to demonstrate that she was subjected to any retaliation for filing her allegations of discrimination.

The plaintiff's retaliation claims largely turn on an assessment of the credibility of the witnesses. While the plaintiff clearly believed that she was the victim of retaliation, the evidence did not support that belief. The court finds the plaintiff's testimony with regard to many of her allegations to less accurately reflect the events that occurred than the testimony of Morris and other witnesses. It is clear that the plaintiff's recollection of the relevant events was shaped and twisted by her own, ill-founded perceptions. The plaintiff's jaundiced attitude about the manner in which she was treated by Boeing permeated her testimony. For example, at trial the plaintiff was still smarting from the sting of the $500 decrease in salary that had occurred over a decade before. *See* Finding of Fact # 1, n. 1. The plaintiff unjustifiably viewed every remark and comment as motivated by a desire to retaliate, rather than an attempt to conduct business in the regular and ordinary manner.

In short, the plaintiff's paranoia and hypersensitivity to even legitimate and constructive criticism was evident throughout the trial. Consequently, the court gave little credence to the plaintiff's testimony.

7. The court will address each of the plaintiff's specific claims of retaliation *seriatim:*

(a) Specifically, the court finds that Morris did not systematically take away Steinle's job duties. The use of a model contract lightened the plaintiff's workload as she did not have to start from scratch on each draft. Other legitimate reasons explain the decrease in the volume of work assigned to Steinle.

(b) Even if Morris increased his monitoring and scrutiny of Steinle's work, that increase was based upon the legitimate need to supervise her work. For whatever reason, the plaintiff would not follow Morris' reasonable instructions, thereby necessitating additional supervision.

(c) Morris was critical of Steinle's work, but that criticism was justified.

(d) Morris, in the reasonable exercise of his discretion, denied all of Steinle's requests for overtime.

(e) The plaintiff claims that Morris and certain coworkers personally ridiculed and made fun of Steinle and/or her work. This claim was not proven to the satisfaction of the court. The defendants denied that such instances occurred. The court credits their testimony on this issue. The plaintiff was not able to recall, except in very general terms, any instances of which she

complains. The court finds no merit to this claim.

(f) Morris denied that he was rude or unfriendly to Steinle. The court finds the testimony of Morris and other witnesses on this issue more credible. Assuming, *arguendo,* that Morris was not as pleasant to Steinle as he was to other employees under his supervision, Steinle did not prove that such treatment stemmed from a retaliatory motive. Independent of the fact that she had filed a claim of discrimination, Steinle's attitude about her job, as well as her unwillingness to cooperate with Morris in regard to his legitimate requests explained any differential in treatment perceived by the plaintiff.

(g) The plaintiff failed to demonstrate that Morris' reprimand of her for excessive telephone calls was based upon a retaliatory motive. Morris could have reasonably believed that the plaintiff received excessive phone calls, and it was clearly his prerogative to establish reasonable limits on the use of Steinle's time while she was at work.

(h) The court is not persuaded that Morris required Steinle to rigidly adhere to a daily work schedule any more than other employees under his supervision.

(i) Transferring Steinle out of Org. 6320 to an opening in the Planning organization was a reasonable, non-retaliatory action by Boeing to resolve the situation created by Steinle's inability to comply with Morris' reasonable, legitimate requests.

In sum, the court finds that the defendants have articulated legitimate, non-retaliatory reasons for each act of which the plaintiff complains. The court further finds that the plaintiff has not demonstrated that these reasons were pretextual. The court attributes the plaintiff's difficulties in her employment relationship with Boeing primarily to her own recalcitrant behavior.

8. The defendants seek to dismiss the plaintiff's KAAD claims for failure to file a petition for reconsideration with the Kansas Human Rights Commission within ten days of dismissal of her complaint as required by K.S.A. 44–1010. *See Simmons v. Vliets Farmers Coop Ass'n,* 19 Kan.App.2d 1, Syl. ¶ 2, 861 P.2d 1345 (1993) ("A claimant must file a petition for reconsideration of any Kansas Human Rights Commission order or action to exhaust administrative remedies and preserve the right to pursue an independent claim in district court."). The plaintiff agrees to the dismissal of her KAAD claims. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law (Dk. 151) at page 21.

### Summary

Each attorney zealously represented his or her client(s) in a professional manner. Objections to the evidence and testimony were made appropriately and sparingly by each party. In short, this case was well tried and all counsel are commended for their efforts.

Simply put, the court concludes that the plaintiff did not carry her burden in this case. Consequently, the defendants are entitled to judgment in this case.

IT IS THEREFORE ORDERED that the clerk of the court shall enter judgment in favor of the defendants.